### In re MEYERS (two cases).

(District Court, S. D. New York. August 24, 1899.)

1. BANKRUPTCY—PARTNERS—SEPARATE INDIVIDUAL PETITIONS—DISCHARGE.

Partners are not entitled to a discharge in bankruptcy, affecting the debts of the firm, when the partnership, as such, is not in bankruptcy, but only the individual partners on their separate voluntary petitions, and when there is evidence of the existence of firm assets not brought into the bankruptcy, or circumstances justifying the inference that there has been a fraudulent concealment of partnership assets.

2. SAME—OPPOSITION TO DISCHARGE—CONCEALMENT OF ASSETS — BURDEN OF PROOF.

On opposition to a bankrupt's application for discharge, where creditors have shown the existence of assets and their disappearance or large shrinkage within a short time before the bankruptcy, the burden is on the bankrupt to account for the diminution of his estate; and, if he fails to give a reasonable and credible explanation, the court will be justified in inferring a fraudulent concealment of assets, such as to forfeit his right to a discharge.

In Bankruptcy. On applications of two bankrupts, Amelia A. Meyers and George H. Meyers, respectively, for discharge.

Weed, Henry & Meyers and S. F. Kneeland, for petitioners.

Black, Olcott, Gruber & Bonynge, Platzch & Strock, and Blumensteil & Hirsch, opposed.

BROWN, District Judge. The above applications for discharge arise in two independent proceedings upon separate voluntary petitions filed respectively on February 11 and February 27, 1899, by the individuals comprising the firm of Meyer Bros. which was engaged for several years in the business of manufacturing and selling garments at 622 Broadway, New York City, and failed on November 27, 1896. The firm affairs were never settled. Nothing after the failure was paid upon the merchandise debts, which amounted to about $55,000. The business was conducted under the exclusive management and control of Abraham Meyers, an insolvent and the husband of Amelia A. Meyers, one of the partners. She herself gave no attention to the firm affairs and was not informed of the details of the business. George H. Meyers, the other partner, acted for a part of the time as salesman, and for part of the time as bookkeeper, but did not exercise any control in the conduct of the business. Abraham Meyers, as general manager, attended to all the finances also; and upon his own account he drew what he liked, not being employed upon any definite salary. In 1896 he drew on his personal account $6,681.53.

Early in February, Abraham Meyers made a statement of the firm's financial condition to Wood's Commercial Agency, showing a surplus of $73,180 on January 2, 1896. The testimony of the bankrupts' expert upon this hearing, is that their books show a surplus on that date of about $29,000, their assets at that time consisting of cash in bank $5,506, fixtures $2,246, merchandise on hand $22,013, and outstanding accounts, deemed good, $23,245, while their indebtedness was, for merchandise $12,886, and for other moneys owing, $11,163. Some further testimony made the goods on hand on January 2, 1896, about $3,200 less than appear on the books, and the cash about $1,800 less; thus reducing the apparent surplus on that date to about $24,000. Of the sum of $23,245, outstanding good accounts on January 2d, about $12,000 was collected prior to the failure on November 27th; so that even if the remaining $11,200 of those accounts were disregarded, there would still be a clear surplus of $13,000 on January 2d, and the indebtedness of about $65,000 without assets upon failure on November 27th, would make a loss of $77,000 between January 2d and November 27th to be accounted for. The deficiency calling for explanation is in reality over $10,000 more than this; that is, over $87,000; since, according to the testimony, the firm borrowed about $22,000 during 1896 from Charles Meyers, Mrs. E. B. Marks and L. Stein; and at the time of the failure the firm paid to them in checks received and in good accounts only about one half the amounts due to them, leaving unpaid the other half, which it is said was released by them, so that their names do not appear as creditors in the schedules.

At the time of the failure on November 27, 1896, a chattel mortgage was given upon whatever remained of the stock of goods on hand and on the fixtures, to one Henry Moss to secure $6,000, which had been borrowed of him on November 10th, and with which a firm note due on that day at the Chemical Bank for the same amount was taken up. That loan was guarantied by Abraham Meyers' brother, Charles Meyers, who has appeared as the attorney of the bankrupts on these proceedings. Soon after the failure, the chattel mortgage was foreclosed, the property was bid in by Charles Meyers for $3,200 or $3,300, and a deficiency judgment entered up for $3,000 in favor of Moss, which appears as a debt on the schedules. Afterwards Charles Meyers settled with Moss. Soon after the foreclosure, Charles Meyers organized a corporation, called the Meyers Bros. Clothing Company, for the sale of the goods bought in and turned over to that corporation, of which Charles Meyers was president, and Abraham Meyers was secretary, treasurer and manager, and George H. Meyers was salesman; the two latter thus holding nearly the same relative positions in the corporation that they held previously in the firm of Meyers Bros. These goods were sold out in the following six or eight months, and the corporation then went out of business, and in 1898 Abraham Meyers destroyed its books of accounts, so that no record evidence was available on this hearing of the amount, value or proceeds of the goods mortgaged and through the sale to Charles Meyers turned over to the corporation; nor could any satisfactory direct testimony on that point be extracted from the witnesses in these proceedings. From what can be gathered, however, from the books and

the expert's testimony, the fixtures and goods remaining at the time of the failure should have amounted to at least $40,000 in value, as will appear from the following items:

| | |
|---|---:|
| Fixtures | $ 2,200 |
| Goods on hand Jan. 2, 1896 (corrected amount) | 19,800 |
| Merchandise thereafter bought in 1896 | 63,000 |
| Cash expended in making up (alleged) | 33,000 |
| Store expenses, salaries and traveling | 24,000 |
| Total | $142,000 |
| Less goods sold during 1896 | 62,000 |
| | $ 80,000 |

Unless a business is conducted at a loss, all expenses must be made good out of sales, and the above items of expense, therefore, enter into the presumptive value and selling price of the goods. Abraham Meyers testifies in a general way that the business was conducted at a loss during 1896; but he says the firm was solvent in July, 1896, and he ascribes the failure to a run on the firm by its creditors in the early part of October. No previous losses or reverses of any kind are intimated; so that up to October the loss, if any, on the sale of about $30,000 of goods up to that time, must have been comparatively small. After that date, the testimony is that sales were somewhat pressed for cash, mostly at 10 per cent. discount, with a few larger discounts on the eve of failure. If however, half of the item of $24,000 for business and store expenses and salaries were deducted as lost, and $23,000 more for additional sacrifices on the sales, amounting to $32,000, in October and November, which is a considerably greater deduction than anything I can find in the testimony to justify, there should still have remained $45,000 in value at the time of failure to be covered by the chattel mortgage, and disposed of in the way above stated, leaving apparently nothing for the payment of $62,000 debts to the general creditors.

In the above estimate, $33,000 has been allowed for labor expended in making up goods during 1896, as that amount stands charged in the "Labor Account" in the firm books. The correctness of this amount has, however, been challenged. The absence of a cash book makes it impossible to verify the correctness of this item as well as others. The evidence is that the goods remaining at the time of failure were almost wholly piece goods, i. e. goods not made up; and if these amounted to $40,000 in value, the other evidence shows that $33,000 could not have been expended in making up the other goods purchased in 1896. Of this sum of $33,000 charged to "Labor Account," the extraordinary sum of $15,895.15 is charged up for the months of October and November. The ledger has apparent reference to some other account book not produced; the testimony is that no cash book was kept; and without a cash book the bankrupts' expert says that the books were not complete, nor proper books of account.

The above facts appear partly from the original examinations of the bankrupts and partly in the testimony taken before the different referees on the reference of the numerous specifications in opposi-

tion to the discharge. From all this testimony, and from the utter failure by the bankrupts to supply any adequate, credible, or intelligible explanation of their alleged loss of assets, and the circumstances and manner of the failure, the inferences which might reasonably and naturally be drawn, and which a jury would be justified in finding, would be that the business of 1896 was fraudulently conducted; that the failure was unnecessary and fraudulent, and designed to cheat the merchandise creditors; that the chattel mortgage given upon the fixtures and a large stock of piece goods remaining at the time of failure, its foreclosure, and the transfer of the goods to the Meyer Bros. Clothing Company, were not merely to secure the debt of $6,000 guarantied by Charles Meyers, but upon a secret trust for the benefit of the bankrupts as well; and that the new corporation carried on by the same hands as before, was but an attorney's device for closing out the firm's stock of goods for the firm's benefit as well as for securing the attorney's claim; that it was in substance a continuation of the firm's business, and was fraudulent as to creditors; and that the present withholding of all definite information in regard thereto, and of the value of the assets transferred or the proceeds derived therefrom, is a concealment of the firm's assets; and that the destruction of its books in 1898, were in presumptive contemplation of bankruptcy, and in order to prevent the true state of the firm's assets on its failure in November, 1896, from being ascertained.

It is not necessary that definite findings to the above effect should be here made; though, as I have said, I think they would be justified. But the general situation disclosed is such as makes it clearly improper to grant a discharge in either case, upon these independent and merely individual proceedings by the two partners. The petitions ask a discharge from individual and from co-partnership debts. No individual debts are stated; all the debts in each petition are stated to be firm debts only. No adjudication of the firm as a bankrupt is asked, nor could such an adjudication be made without a formal application therefor, and the presence of both partners in the same proceeding. Where there are absolutely no firm assets, separate proceedings may be valid, and a discharge of each partner separately may possibly be had, because the firm debts are several as well as joint. But where there are firm assets, they must be duly administered in bankruptcy in a single proceeding; and the right to a discharge is an incident to that single proceeding and to the administration of all the assets, whether firm or individual, according to the provision of law in such cases. Rule 1 of this court calls attention to this precaution, requiring all petitions like the present to state whether or not there are firm assets. The same caution has been frequently repeated from the bench. These petitions state that there are no firm assets. The regularity of these separate individual proceedings, and the authority of the court to grant a discharge from co-partnership debts on such separate proceeding, hinge upon the truth of that allegation. The proceedings are essentially independent. Different trustees have been appointed in them. But neither trustee represents the firm, or would have any authority to collect or to receive any firm assets. By section 29 of the bankrupt act, conceal-

ment of assets from the trustee is made an offense, and it would bar a discharge under section 14. But in individual proceedings like these, a concealment of firm assets would not fall within section 29, because firm assets do not belong to the individual estate; and the individual estate is all that either trustee in these proceedings represents. Where firm assets exist, the only discharge that could be granted in an individual proceeding would be from individual debts only; and here there are no such debts.

This branch of the case turns, therefore, upon the fact whether there are firm assets or not, or such a reasonable inference that there are firm assets as to require opportunity to be given to creditors to collect them through a firm trustee in bankruptcy. The evidence on this point shows (1) a small balance of $5 to the firm's credit in the Chemical Bank. If there were nothing else, possibly this might be deemed too insignificant to be regarded. But there are (2) about $11,000 of unpaid accounts, which were outstanding on January 2, 1896, and then deemed good; and also about $1,800 of unpaid accounts on sales in 1896, which were not paid up to November 27th, and according to the testimony, have not been since disturbed.

It is contrary to common experience that out of so considerable an amount of recent overdue credits, owed by three or four scores of debtors, nothing whatever should be afterwards collected. The presumption is that such accounts are of some value, and the burden of proof is upon the bankrupts, in maintaining the regularity of separate petitions like these, to show satisfactorily that these apparent assets are actually worthless. This may be difficult to prove; but in filing individual petitions only, the petitioners voluntarily undertook that burden, and must successfully support it. On the hearing in these cases no competent evidence on that point has been given. The expert's reference to the remarks of Abraham Meyers as to the value of these accounts, is not evidence, and is not entitled to any weight.

More important are (3) the assets of the firm, presumptively to a large amount, on hand at the time of the failure, and disposed of in the manner above described, in part at least presumptively in fraud of creditors. When, as in the case of this firm, a large shrinkage or disappearance of assets within a short period preceding failure cannot be explained in any rational or intelligible manner, the inference is justified of a fraudulent withdrawal and concealment of assets. The facts above referred to are abundant to call for explanation, and to throw the burden of proof upon the bankrupts to exculpate themselves from the reasonable inference and presumption of a fraudulent transfer and concealment; and, where the creditors have proved the existence of large assets, the burden then falls upon the bankrupts to account for their disappearance. Creditors have the undoubted right to ascertain the existence of such assets, and to collect them through an accounting by the persons in apparent possession of them, if proved to exist, through appropriate proceedings therefor by a trustee in bankruptcy. That trustee, as I have said, must be a firm trustee, appointed upon an adjudication of the firm as

bankrupt, in a joint proceeding to which both partners are parties, whether voluntary or involuntary.

Such proceedings to enforce the rights of creditors could not be had through either of the trustees in these individual proceedings; and if the bankrupts were to be now discharged from the firm debts as prayed for, no future firm trustee could be appointed to enforce the rights of creditors, because no further proceedings against the firm could be instituted, there being no longer either debtor or creditor. A discharge of the bankrupts now, would therefore be incompatible with the rights of creditors secured to them by the bankrupt act, to receive whatever may be obtained from the outstanding accounts, or rescued through a firm trustee from presumptive frauds.

The applications for discharge in these individual proceedings should, therefore, be denied.    Under circumstances like the present showing presumptive assets, any such relief must be sought in a firm proceeding, and upon an adjudication of the co-partnership as bankrupt, in which a trustee of the firm assets may be appointed, through whom the rights of creditors may be preserved and enforced.    Until then the questions of law under sections 14 and 29 do not properly arise.