## In re MARGOLIS et al.

(District Court, D. Massachusetts. June 14, 1909.)

No. 11,977.

BANKRUPTCY (§ 414*)—DISCHARGE—OBJECTIONS—CONCEALMENT OF GOODS AND MONEY—EVIDENCE.

On an application for a bankrupt's discharge, evidence *held* to establish specifications of objection charging concealment of goods or proceeds thereof with intent to hinder, delay, and defraud creditors, requiring a denial of the application.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 414.*]

In the matter of bankruptcy proceedings of Meyer H. and Edward I. Margolis. On application for discharge. Denied.

Josiah Bon, for bankrupts.

French & Curtiss and Richard B. Coolidge, for objecting creditors.

DODGE, District Judge. These two brothers, copartners in a wholesale grocery business in Boston, were adjudged bankrupt January 7, 1907, on a creditors' petition filed December 4, 1906, alleging their insolvency and that they had preferred creditors to the petitioners unknown. They made no opposition to adjudication. Their schedules, filed March 27, 1907, showed a total firm indebtedness of $12,786.39, and firm assets amounting to $4,650, $4,300 of which consisted in book accounts. The trustee realized less than $100 from all the assets he could discover. The individual assets and liabilities scheduled by each partner were inconsiderable.

On January 4, 1908, both partners filed applications for discharge. Two creditors have objected and filed specifications. The trustee stated in a report filed June 9, 1908, among other things, that he believed the bankrupts had not accounted for all the goods purchased by them, and that, if certain cash sales of goods were bona fide, the proceeds had not been properly accounted for.

On June 15, 1908, there was a reference of the specifications for ascertainment of facts and report. In his report, filed February 16, 1909, the referee found none of the specifications sustained.

Upon consideration of the report and of the evidence before the referee, which is made part thereof, I agree with the referee in believing that the charges of destruction, concealment, or failure to keep books of account, from which the bankrupts' financial condition may be ascertained, with intent to conceal their financial condition, are not sustained, if these charges be considered independently of the further charges below mentioned. Books were kept and were turned over to the trustee. They appear to correspond in general with the schedules filed. The utmost that the evidence can be claimed to show in regard to them is that the entries in them are such as to afford indications that property has been concealed.

The case made by the objecting creditors upon the charges of concealing property from the trustee or with the intent to hinder, delay, and defraud creditors is, to my mind, much stronger than is recognized

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by the referee in his report. It rests mainly upon what has been admitted and upon what is left unexplained by the bankrupts themselves in their own testimony. They carried on the business in which they failed, from August, 1904, to December, 1906. By their own admission, the indebtedness of $12,000 and over, which their schedules show, was substantially all contracted between June 1 and November 1, 1906, for goods bought on credit during that period, while before these purchases began the stock of goods carried had been of from $3,000 to $4,000 in amount. By their own admission they sold during the same period all the goods on hand in June and all bought by them thereafter, at a good profit. And, by their own admission, they were insolvent in November and had no goods at all in their store at the time of their bankruptcy early in December. The last of the goods, according to their statement, a few hundred dollars' worth only, were taken by an attaching officer under a writ brought by a creditor to whom they owed $50 or thereabout. This history seems to me to differ so widely from that which, according to common experience, would be expected in the case of an unsuccessful business enterprise honestly conducted, as to call for explanation and to demand a careful scrutiny of such explanation as may be attempted.

If the goods referred to or the proceeds received from them really went to pay debts other than those scheduled, or in legitimate expense of the business or living expenses of the partners, the books, together with the candid testimony of the bankrupts, ought readily to make these facts appear. As the case stands, not only do the books and the bankrupts' testimony fail to establish such a state of facts, but, to my mind, they afford strong ground for the belief that a very different disposition of the goods referred to, or their proceeds, has been made.

First as to the disposition of the goods themselves: Before October, 1906, by far the greater part of the sales made appear by the books to have been sales on credit. During May, June, July, and August, 1906, the cash sales were less than 10 per cent. of the total. But during the three months and four days from September 1st to the bankruptcy, the cash sales appear as 80 per cent. of the total. The referee accepts as a satisfactory explanation of this change the bankrupts' testimony "that their business during the summer months was dull, but that it revived late in the fall." The total of sales, cash and credit, for the four months before September 1st, is $12,822; the total for the period from September 1st to the bankruptcy is $15,193; so that it is true that the entire business done appears to have been $2,371 greater, an increase of less than 20 per cent. I am unable to see how such an increase of the business done by a wholesale grocery concern tends to explain, or render more probable, the very great increase in the proportion of cash to credit sales. A further noticeable circumstance regarding the alleged cash sales between September 1st and December 4th, as they appear on the books, is the increased amount of the several transactions. On October 4th, 19th, and 24th there are entries of cash sales exceeding $1,000 in amount; the largest being $1,418.22 on October 19th. On October 3d, 4th, 5th, 26th, 27th, November 12th and 22d there are entries of cash sales exceeding $500; the largest being $915.46 on October 27th. On October 6th and November 23d

there are entries of cash sales exceeding $400. Between May 1st and September 1st the largest cash sale entered is $97.01, and there is no previous entry of a cash sale since the business began of so large an amount as $500. The bankrupts' suggestion that the sale appearing on the books as $1,418.22 might be five or six sales in one item, as it appears in the record, has every appearance of being an afterthought. There is no evidence, and, as it seems to me, very little reason to believe, that this item or any one of the similar items was in fact so made up.

The books, in the case of cash sales, afford no means of verifying what they purport to show, because they do not, as in the case of credit sales, disclose the purchaser's name. But if the entries of cash sales represent actual transactions wherein goods were delivered to a purchaser in exchange for the amount of money stated, I do not see how, under the circumstances, the bankrupts can reasonably expect it to be believed that they are really unable to recollect in a single instance who the purchaser was. The cash sales of largest amount were made within the two months of October and November, 1906. Edward I. Margolis had before the failure been in the place of business all the time, deciding all questions which presented themselves in the business, and making practically all the sales which were made. When examined in June, 1907, he "could not remember" to whom he made the sale of $583.53 worth of goods sold October 3, 1906, for cash, according to the books, nor who the purchaser was in the case of the sales of $1,090.76 and $518.33 on October 4th, $749.11 on October 5th, $418.39 on October 6th, $1,418.22 on October 19th, $1,022.89 on October 24th, $869.44 on October 26th, $915.46 on October 27th, $543.92 on November 12th, $218.67 on November 21st, $615.76 on November 22d, $424.36 on November 23d, $298 on November 27th, $177.87 on November 28th, $156.44 on November 30th. The total of the above-alleged cash sales, made according to the books, within these two months is more than $10,000. The other bankrupt, Meyer H. Margolis, who shipped the goods, if they were sold as the books state, was equally unable to give, in the following June, any particulars regarding the purchasers or where the goods were sent. I am unable to believe that the bankrupts were honestly unable to remember anything more than they have told regarding the disposition of these goods. Considering that the purchases between June 1 and November 1, 1906, had been out of the ordinary course of their business,—that in the ordinary course of their business no such amount of goods as the books show would have been sold during October and November, 1906, nor any such amounts sold for cash,—the strong reasons found in the evidence for believing that they must have known, before October, that they would have to fail, —and their professed inability, eight months later, to remember any details which would have made verification of the book entries possible,— I consider the indications that the real facts are being withheld, because the bankrupts are afraid to let them be known, too strong to be disregarded. I am obliged to regard the book entries and the bankrupts' testimony about them as discredited, and the disposition of the goods which the entries of cash sales purport to represent as unexplained.

Although direct contradiction of the book entries is impossible, the

circumstances have thrown a burden upon the bankrupts of proving their assertion that the goods went to bona fide purchasers for the amounts set down in the books, which they have failed to sustain. The goods having disappeared, and the only attempt at accounting for their disappearance being thus unsuccessful, I think the specifications which charge transfer, removal, or concealment of goods with intent to hinder, delay, and defraud creditors sufficiently established by a fair preponderance of evidence. In re Meyers (D. C.) 96 Fed. 408; In re Leslie (D. C.) 119 Fed. 406; Seigel v. Cartel, 164 Fed. 691, 90 C. C. A. 512.

The above conclusion might be unwarranted if it were possible to say that the cash received from these goods, according to the books and the bankrupts' testimony, is satisfactorily accounted for. But, even if the entries on the books be accepted as a correct account of the disposition of the goods, and the burden to be sustained by the bankrupts be described as the burden of explaining how the large amount of money realized by these sales came to disappear before their bankruptcy, I am unable to see that they have accounted any more satisfactorily for the money than for the disposition of the goods. Only a very inconsiderable portion of the money appears to have been deposited in any bank account, and the firm's bank books, checkbooks, and checks, therefore, afford no assistance in showing what they did with by far the greater part of it. There are entries in the books which purport to account for it; but they are entries which afford little or no information in themselves, of the kind required under the circumstances, and such further information as the bankrupts are willing to attempt in their testimony seems to me subject to grave suspicion, where it is not to be regarded as wholly inadequate, in any event. According to the books, the two bankrupts withdrew in cash from the firm's funds between October 1st and December 4th the amount of $3,742.03; nearly all of it in amounts ranging between $169 and $674. Never before October 1st had their withdrawals been at anything like the same rate. They can give no account at all of the use they made of more than $700 out of this amount. The account they give of the use made of the remainder I find myself unable to regard as an honest account. Their books also show payments in October and November to Max Herman and Israel Herson, employés of the firm on salaries of $15 per week, to the amount of all of $1,220; but the evidence wholly fails, in my opinion, to show that they really owed these persons any such amounts as are said to have been paid them. Under date of November 21st is an entry in the cash book of "Expense, $118" which is unexplained, and is much larger than any item of "expense" found in the books under previous dates. $262.33 deposited in the United States Security Company and $300 deposited in a trust company were not found on deposit at the bankruptcy, and there is no check or explanation to show where the money has gone. Two notes, one of $300 and one of $500, appear by the books to have been paid December 4, 1906, the day the petition was filed. Who it was that got the money there is nothing to show, nor could the bankrupts recollect when asked about them in the following April. One of the bankrupts sold certain cut glass belonging to the firm for $106, after the bank-

ruptcy, and never accounted for the money to the trustee. He claims to have paid $6 of the amount for freight and $48 for wages due to Herman above mentioned and to another employé of the firm. If this transaction stood by itself, these statements might perhaps be accepted as true and the explanation that the bankrupt used the remaining $52 for personal expenses might be accepted as satisfactory. The view of the character of the bankrupts' testimony in general which I find myself obliged to take, as above stated, prevents me from thus accepting either the statements or the explanation.

For the reasons above given, I consider the charges of concealment of goods, or of money received for them, established by a fair preponderance of the evidence. A fair preponderance is, in my opinion, enough. In re Delmour (D. C.) 161 Fed. 589.

The application for discharge must be refused.