## In re MENDELSOHN.

(District Court, S. D. New York. May 16, 1900.)

BANKRUPTCY—OPPOSITION TO DISCHARGE—CONCEALMENT OF ASSETS.

Where a comparison of the bankrupt's assets and liabilities, as scheduled in the bankruptcy proceedings, with an itemized statement of his affairs made a few months before, and admitted to be correct, showed a large shrinkage or disappearance of assets, of which he failed entirely to give any satisfactory explanation, and his books of account, shown to have been in his possession at the time of his failure, were not produced, except a ledger, out of which many leaves had been torn, the evidence tending to show that the mutilation had been done by the bankrupt himself, *held*, that the evidence justified a finding that he had concealed property from his trustee, and intentionally suppressed his books, and that his application for discharge should be denied on that ground.

(Syllabus by the Court.)

In Bankruptcy. On bankrupt's application for discharge and opposition thereto by creditors.

Arthur Furber, for bankrupt.

Epstein Bros., for creditors.

BROWN, District Judge. The discharge of the bankrupt is opposed on the ground of the concealment of property and of a fraudulent suppression and mutilation of his books of account. I have carefully read all the evidence bearing on these questions and am of opinion that a jury of merchants would unhesitatingly find the objections sustained by the evidence.

The bankrupt's petition was filed on September 24, 1898. In February previous he bought out his former partner and continued the business of manufacturing and selling clothing at 7 Lafayette Place, and thereafter continued the business until the middle of July, when he sold out his stock and fixtures for $3,800. He settled the debts of the old firm by giving his own notes to the extent of 87½ cents on the dollar, payable at four, six and eight months. The first installment of notes was paid; but before the others became due, he sold out as above stated. In March and April he gave an itemized statement of his assets and liabilities, which he now testifies was correct, as representing his condition on March 1, 1899, and showing assets amounting to $65,000, obligations, $28,000, and a surplus of $37,-662.18. Of this amount about $12,300 is an estimated equity in real estate which was mortgaged to secure certain bonds included in his indebtedness. Excluding these items on both sides, the apparent surplus in his business was about $25,500. His verified schedules filed in September following, show no assets except two outstanding accounts amounting to $2,700 assigned as collateral security; while his outstanding unsecured business debts amount to about $15,500. This shows an apparent loss of assets in about six months of $41,-000, to which should be added $1,000 in cash, loaned him by the State Bank, and for which the collateral above mentioned was pledged; a loss in all, therefore, of about $42,000.

In his statement his annual sales were put down as $65,000. He had two stores. One was at No. 7 Lafayette Place, in which the merchandise was stated at value to be $26,000, accounts and notes considered good at $4,000, cash on hand and in bank $3,500, and machinery and fixtures $1,000; and a retail store at Hackensack in which the stock was stated at $6,000. His unsecured liabilities were stated to be $13,756. From March until he sold out in the middle of July, his purchases of goods he says were about $6,000. He states no special causes of loss other than poor business, involving a loss of about 10 per cent., and a few bad debts apparently of little account. About the middle of July his stock at Hackensack, which he says was kept up to about the same value of $6,000, was sold to his sister for $1,000 in consideration of a debt owing to her to that amount; and about the same time his stock at Lafayette Place was sold upon a day's notice to a Mr. Miller, previously a stranger, for $3,800 cash, at 70 per cent. of an appraisement made by Mr. Miller himself. The bankrupt's bookkeeper testifies that an appraisement was made by him and the bankrupt and another a few days before, and that the stock was then estimated at $11,000. The bankrupt says this was a cursory and inaccurate inventory. Of the $3,800 received for the stock, the bankrupt states payments to the amount of about $2,500, including $1,000 paid to his counsel to take him

through his troubles, no bill of which, however, has been rendered, or any further account given.

It scarcely seems credible that a debtor having any honest intention towards his creditors could without consultation with them sell goods worth $11,000 for $3,800; or a store worth $6,000 for $1,000. Assuming, however, that this apparent waste of assets was real, it accounts only for a loss of about $12,000 out of $42,000. All other losses suggested by him do not amount to over $7,000, leaving at least $23,000 wholly unaccounted for.

Again, between March 1st and July 14th he bought about $6,000 of goods, making in all $32,000, of which by the inventory in July, there remained only $11,000,—a difference of $21,000; while the sale at $3,800 on July 14th on a 70 per cent. basis, would make the stock at that time worth only $5,430 instead of $11,000, a further diminution of over $5,000, making a diminution in stock of $26,000 to be accounted for by sales; and yet the outstanding accounts and cash on hand as scheduled are $5,000 less than appeared in the statement of March 1st, and his debts considerably greater. It is impossible to believe that assets to such an extent were either lost or wasted by a man of the defendant's experience in business; or that if they were lost he could not give some intelligible account of it.

It is evident that in order to obtain any understanding of the course of the bankrupt's business, or explanation of the disappearance of his assets, his books of account are indispensable. Proper books were kept by his bookkeeper and were balanced within a few days of the time when he sold out in July. None of these books, however, are produced except a ledger, which has been mutilated by many leaves being torn out, only a part of which have been produced. The most important leaves, containing the bankrupt's personal account, the expense account and the sales, are missing. All his books, consisting of ledger, cash book, check book and tailor's book were taken to the bankrupt's house about the time he sold out. The bankrupt testifies that they were given to his bookkeeper to enable him to make up some disputed accounts with the tailor, and that only the ledger was returned to him by the bookkeeper with the leaves torn out, a portion missing and in the same condition as they were produced before the referee. Not only were leaves torn from the book, but in the alphabetical index the names were cut out from the index pages. The bookkeeper testifies that he took the tailor's book alone from the bankrupt's house, for the purpose of correcting his account; and that he saw the bankrupt himself tear the pages from the ledger, and that he never had the ledger or the other books at his own house.

The explanation given for the mutilation is, that the ledger had not been much used and was good for future use, and was so used in the subsequent business of the bankrupt's wife from and after August, 1899. One of the leaves cut out and returned, has upon it the account of one of the wife's customers, showing that that leaf was removed after the time when the bankrupt states that his book was returned to him by the bookkeeper, and that that leaf could not have been cut out by the bookkeeper. Some circumstances appear

that tend to impair entire confidence in the bookkeeper's testimony. I place no confidence, however, in Deutsch's testimony against him; his positive statements as to the material points about the check for $83 were in the end withdrawn, and confirmed the bookkeeper's general account of the matter. So far as it appears, the bookkeeper had no interest in the mutilation of the book, while the condition of the assets shows that presumptively the bankrupt had a very great interest in it. Had the leaves been cut out by the bookkeeper in consequence of his knowledge or participation in any business irregularities, he would not naturally have omitted to remove a page which still remains and which shows an irregularity in an entry made by him which the bookkeeper himself states was untrue, though made by the bankrupt's order, that the account of Deutsch was closed by a return of goods instead of by a payment of cash; neither does it appear that the bookkeeper could have had any interest in cutting out the leaves concerning the bankrupt's personal account, or expenses, or sales, or in not producing them if they were removed by him. I find nothing either in the evidence or in the circumstances or in the probable motives to confirm the bankrupt's testimony, and his endeavor to shift from himself to the bookkeeper the responsibility for the mutilation and nonproduction of his books.

In order to secure any effective administration of the law in bankruptcy, it is indispensable to hold bankrupts to the performance of the duties imposed upon them by the act, and to deny them a discharge where the only reasonable inference from the testimony and exhibits made, is a concealment of assets and intentional nonproduction of books, which might otherwise account for their disappearance.

Discharge denied.