### In re BEMIS.

(District Court, N. D. New York. November 9, 1900.)

BANKRUPTCY—RIGHT TO DISCHARGE—CONCEALMENT OF PROPERTY.

A bankrupt had for some years been doing a very large and lucrative business as an eye specialist, and had accumulated property, all of which he transferred to his wife; and within a year prior to filing his petition in bankruptcy he also transferred his business to her, claiming thereafter to have been employed by her at a salary. No consideration was shown for the various transfers, there was no visible difference in the conduct of the business, and the bankrupt continued up to the time of filing his petition to keep a bank account in his own name, from which he had checked several thousand dollars within the previous two years in payment of insurance, repairs, taxes, etc., on property previously transferred to his wife; but he kept no books from which the state of his affairs could be learned, and made no report accounting for the money so paid out or for his salary. *Held*, that he was guilty of a fraudulent concealment of his property, as well as a failure to keep books, which debarred him from the right to a discharge.

In Bankruptcy. On motion to confirm report of referee recommending that a discharge be denied the bankrupt, and on exceptions thereto.

T. D. Trumbull, Jr., for bankrupt.
King & Angell, for objecting creditors.

COXE, District Judge. The specification charging concealment is defective in that the essential averment, that the acts were done "knowingly and fraudulently," is omitted, but as the evidence has been taken upon the theory that the specification was properly drawn, no injury can result from allowing an amendment nunc pro tunc. In re Pierce (D. C.) 103 Fed. 64.

The referee recommends that a discharge be refused upon the ground, first, that the bankrupt has concealed property from his trustee; second, that he has failed to keep books of account or records from which his true condition might be ascertained.

The testimony has been examined with care, in the light of the briefs and of the oral argument, with the result that the court concurs in the opinion of the referee that a discharge should be denied. The bankrupt's conduct in transferring to his wife every vestige of property formerly owned by him, and his neglect to keep any satisfactory record by which his property can be traced or his financial condition ascertained, leads to the inevitable conclusion that these acts were committed and omitted knowingly and fraudulently, and with intent to conceal the true condition of his affairs from his trustee and his creditors. The bankrupt was adjudicated upon his own petition December 1, 1899. Prior to January, 1898, he kept no books of any kind, and since that time his books have been of the most crude and unsatisfactory character, although his business, that of an "eye specialist," has been very extensive, aggregating in one year, 1897, from $40,000 to $70,000. It is absolutely impossible to arrive at an accurate, or even an approximate, estimate of the extent of this business during the four or five years preceding the filing of the petition. Prior to October, 1897, the bankrupt transferred his real property to his wife, but the consideration for the transfer is not shown. In 1899 it is alleged that the entire business was transferred to the bankrupt's wife and that he was employed by her at an annual salary of $2,500. That this transfer was made in view of threatened litigation is not denied by the bankrupt. No attempt has been made to account for the salary. So far as external appearances are concerned the business continued after the transfer precisely as it had before. The transfer of property to the wife without apparent consideration, the failure to keep accurate books, the large and lucrative business conducted by the bankrupt, so far as outward appearances were concerned, in his own name, are all admitted by his counsel, but it is asserted that the property and business were actually and in good faith transferred to the wife and that he has no interest in either. The court could not accept this view even if the testimony stopped at this point. The presumptions drawn from such an unusual and wholesale transfer and the failure to keep books by which the value of the property and business can be traced are incompatible with an honest purpose. But it is not

left to presumption. The bankrupt did not observe even the usual precaution in such cases, of acting, so far as outward appearances are concerned, as agent for his wife. He kept an individual bank account and drew his own checks to pay for taxes, repairs, insurance and interest on the property standing in his wife's name, amounting to over $10,000 in a little over two years. The pretense that this money belonged to the bankrupt's wife has nothing but his testimony to support it, and in no event could she have acquired title to it except by reason of the colorable transfer to her prior to October, 1897. That money earned by the bankrupt in his business, prior to the pretended transfer to his wife, went into this real estate in the form of improvements, taxes, etc., is clearly established by the proof. No part of this money has been accounted for. The testimony further shows that from October, 1897, to January, 1899, the bankrupt paid by his personal checks over $7,000 on stock of the Glens Falls Savings & Loan Association standing in the name of his wife. No return of this money or any part thereof has been made. The transfer of the personal property to the bankrupt's wife in 1894, as testified to by him, vested in her a title as unique as it is informal. He says:

"I transferred my furniture and materials to my wife in 1894. Q. Did you transfer them by written instrument? A. No. Q. How did you do it? A. I simply gave them to her. Q. What did you say? A. I told her I was going to do it and did it. Q. What did you tell her? A. I cannot remember what I told her then. Q. What is your best recollection? A. I gave her to understand the property was all hers."

The business was transferred to Mrs. Bemis on the 1st of January, 1899, in a similar manner.

"I made a proposition to her at home. Q. In whose presence? A. I could not tell you. Q. What did she say to that? A. She was of course willing. Q. Did she say anything about it? A. She told me I understood the business and to manage it. Q. You said that you would carry on the business for her and keep account; was there anything done in writing? A. No, sir. * * * Q. What purpose did you have? A. I was afraid of Dr. Palmer bringing lawsuits against me."

Regarding his system of bookkeeping or, more accurately speaking, his entire lack of system, the bankrupt says:

"Q. Did you have books in which you made or caused to be made entries of any kind during that time? A. No, sir. Q. What were those books? A. Every man has books, don't they? Q. Did you have books? A. I say I never had any regular line of books; I had books, certainly. I cannot remember anything about them. Q. Don't you remember anything about what those books were? A. I cannot tell you anything about that. Q. Where were they? A. I have seen them. Q. Where? A. At the office. ·Q. Where are they now? A. Around somewhere. Q. Where do you suppose they are; have you any idea? A. No."

These books were not produced, but subsequently a book containing stubs of checks was produced but in a mutilated condition, the stubs of checks drawn since September 4, 1899, having been torn out. No explanation of the disappearance of this important piece

of evidence appears upon the record and none has been given which the court is at liberty to consider.

Enough has been said to demonstrate the inequitable and disingenuous conduct of the bankrupt. A large and valuable property has been placed beyond the reach of creditors, and nothing which the bankrupt has said or done has aided the trustee in his endeavor to disentangle the inextricable confusion in which the estate is involved. On the contrary the bankrupt has apparently placed every obstacle which his ingenuity could invent in the path of the trustee, and has so mixed up his own and his wife's money that it is impossible to tell how the account between them stands, even assuming that all the transfers to her are valid. The court is convinced that some, at least, of the transfers to the wife were only temporary makeshifts, intended to meet an unusual exigency, to be ignored as soon as the bankrupt could safely resume dominion over his property. No impartial person can, it is thought, read the bankrupt's testimony without being convinced that some part of the large property which he has earned and handled in recent years, and which is now in the name of his wife, belongs to his creditors, and that the bankrupt has not only concealed this property, but the evidence by which its true status can be discovered. The case clearly falls within the rule enunciated in the following cases: In re Hirschman, 104 Fed. 69, 4 Am. Bankr. R. 715; In re Hoffman (D. C.) 102 Fed. 979, 4 Am. Bankr. R. 331; In re Quackenbush (D. C.) 4 Am. Bankr. R. 274, 102 Fed. 282; In re Walther (D. C.) 95 Fed. 941, 2 Am. Bankr. R. 702; In re Mendelsohn (D. C.) 102 Fed. 119, 4 Am. Bankr. R. 103; In re Bragasa (D. C.) 103 Fed. 936, 4 Am. Bankr. R. 519; In re Welch (D. C.) 100 Fed. 65; In re O'Gara (D. C.) 3 Am. Bankr. R. 349, 97 Fed. 932; In re Ablowich (D. C.) 99 Fed. 81. The report of the referee is confirmed and the discharge is refused.