### TROEDER v. LORSCH et al.

### In re TROEDER.

(Circuit Court of Appeals, First Circuit.    October 2, 1906.)

### No. 645.

**1. BANKRUPTCY—SPECIFICATION OF OBJECTIONS TO DISCHARGE.**

Specifications of objection to a bankrupt's discharge, grounded on the alleged making of false oaths by him in the course of his examination before the referee, should be specific and of such character that their sufficiency may be tested by demurrer or by exceptions analogous to those allowed in equity.

**2. SAME—OBJECTIONS TO DISCHARGE—MEASURE OF PROOF.**

On the hearing of objection to a bankrupt's discharge on the ground that he has committed an offense punishable by imprisonment, while the opposing creditor is not required to establish such offense beyond a reasonable doubt, the evidence must be sufficient to overcome the opposing presumptions as well as the opposing evidence.

**3. SAME—ISSUES—MAKING FALSE OATH.**

On the determination of an issue made by specifications of objection to the discharge of a bankrupt, based on the alleged making by him of false oaths during his examination before the referee, it is not a question of his general truthfulness, but a question as to some specific matter which can be framed into an issue material to the bankruptcy proceedings.

**4. SAME—EVIDENCE CONSIDERED.**

Evidence considered, and *held* insufficient to sustain objections to a bankrupt's discharge on the ground that he committed offenses punishable by imprisonment by concealing assets and making false oaths in the course of his examination.

Appeal from the District Court of the United States for the District of Massachusetts.

Julius Nelson and Edwin N. Hill, for appellant.
Alexander Whiteside (Warren & Garfield, on the brief), for appellees.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge.    This is a proceeding in bankruptcy in which, on an application for his discharge by Samuel A. Troeder, a bankrupt, it was refused by the District Court, followed by an appeal to us by the bankrupt.    The statute on this topic is very narrow, so the whole of it may well be quoted, as found in the fourth section of the amendatory act, approved on February 5, 1903 (32 Stat. 797, 798, c. 487 [U. S. Comp. St. Supp. 1905, p. 684]), as follows:

"b. The judge shall hear the application for a discharge, and such proofs and pleas as may be made in opposition thereto by parties in interest, at such time as will give parties in interest a reasonable opportunity to be fully heard, and investigate the merits of the application and discharge the applicant unless he has (1) committed an offense punishable by imprisonment as herein provided; or (2) with intent to conceal his financial condition, destroyed, concealed, or failed to keep books of account or records from which such conditions might be ascertained; or (3) obtained property on credit from any person upon a materially false statement in writing made to such person for the purpose of obtaining such property on credit; or (4) at any time subsequent to the first day of the four months immediately preceding the filing of the petition transferred, removed, destroyed, or concealed, or permitted to be removed,

destroyed, or concealed any of his property with intent to hinder, delay, or defraud his creditors; or (5) in voluntary proceedings been granted a discharge in bankruptcy within six years; or (6) in the course of the proceedings in bankruptcy refused to obey any lawful order of or to answer any material question approved by the court."

The only part of the section on which the objecting creditors rely is that relating to offenses punishable by imprisonment declared by paragraph "b" of section 29 of the original statute of bankruptcy, approved on July 1, 1898 (Act July 1, 1898, c. 541, 30 Stat. 554 [U. S. Comp. St. 1901, p. 3433]), as follows: First, "having knowingly and fraudulently concealed, while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy"; and, second, having "made a false oath or account in, or in relation to, any proceeding in bankruptcy." On the second branch the objections to the discharge relate to numerous alleged false oaths all of which occurred in the course of the bankrupt's examination before the referee, which commenced at the first meeting of his creditors as provided in section 7 of the original statute. That the answers given at such an examination are within the statutory provisions to which we have referred, and may be made the basis of specifications of objections to a discharge, are clear. In re Gaylord, 112 Fed. 668, 669, 50 C. C. A. 415.

One difficulty in reference to the second branch of the objections to the bankrupt's discharge arises from the fact that the bankrupt's examination was commenced on December 28, 1903, was very voluminous and protracted, and was made in installments, of which the last commenced on February 1, 1905. It was then broken into by the examination of several witnesses, and evidently not completed until some date, not made clear, on or after March 23, 1905. We find incorporated in the specifications what amounts to 15 printed pages of extracts from the bankrupt's examination, including what appears there as so-called direct examination and what appears there as so-called cross-examination, in the precise form in which it was taken down by the referee. There are no allegations setting out specifically any false oath, or explaining its materiality and relevancy, according to any rules of pleading in proceedings at law. Thus this portion of the specifications is clearly insufficient, because the practice with reference thereto is settled in accordance with the fundamental principles of pleading, although not according to strict rules, and to the effect that the allegations must be specific and of such a character that their sufficiency may be met by demurrer, or by exceptions analogous to those allowed in equity. However, no objection is made on this score by the bankrupt, and therefore we refer to the topic simply because the form in which the case is made in this respect has confused the issues, and permits, and, indeed, tends to lead, the court to borrow improperly from one part of the proofs to support improperly other parts; thus ending in the mischief which so often arises where issues are not clearly made. It becomes, therefore, all the more necessary to be careful in reviewing the case as it appears before us.

Questions are made with reference to the amount and weight of proof required on the issues before us. It appears that the referee recommended the bankrupt's discharge. The District Court, however, re-

fused to accept his recommendation. The bankrupt claims that the recommendation of the referee was as effectual as the report of a special master in chancery; but we have expressly held otherwise. In re Pettingill & Co., Lund, Trustee, Petitioner, 137 Fed. 840, 842, 70 C. C. A. 338. On the other hand, this proceeding is not criminal in its character, and therefore the creditor is not bound to maintain his objections by proof beyond a reasonable doubt. As determined by us in In re Cole, Petitioner, 144 Fed. 392, in our opinion passed down on February 16, 1906, ordinary questions of bankruptcy, including those with reference to the concealment of assets, are to be disposed of according to the rules relating to civil cases. Nevertheless, there are many illustrations of the practical fact that a mere preponderance of the formal proofs does not always meet the requirements of civil cases. In referring to them, we pass by instances which rest on the special rules of equity practice, including those regarding bills to set aside governmental patents or formal deeds under seal. Some examples are given in the notes on page 241 of Chase's Stephen's Evidence (2d Ed.), as defenses of usury and propositions to establish gifts causa mortis. In regard to this, the note of the learned editor says:

"The rule, as variously stated, declares that the evidence must be 'clear, unequivocal and convincing,' and 'clear, precise and indubitable,' 'full and clear and satisfactory,' 'clear and conclusive,' " etc.

In Smithsonian Institution v. Meech, 169 U. S. 398, 399, 405, 18 Sup. Ct. 396 (42 L. Ed. 793), the opinion states, with reference to an alleged oral agreement as to the terms on which certain real estate was to be held, that "the law is content, if, from a perusal of the entire record, the mind is sure that there was a distinct agreement as claimed." In Gage v. Bani, 141 U. S. 344, 357, 12 Sup. Ct. 22, 27 (35 L. Ed. 776), on an issue asserting a tax title, the opinion says that, on a question whether a notice was given which the statute required, the evidence should be "clear and convincing." In Schreyer v. Scott, 134 U. S. 405, 409, 10 Sup. Ct. 579, 580 (33 L. Ed. 955), with reference to a claim that certain transfers were void as against subsequent creditors, the opinion says that "very clear and direct testimony" is essential. A more striking illustration is with regard to alleged anticipatory matter in suits relative to patents for inventions as many times expressed, and which, as in Smith Company v. Sprague, 123 U. S. 249, 264, 8 Sup. Ct. 122, 130 (31 L. Ed. 141), contain such statements as that the proof must be "full, unequivocal, and convincing." That these expressions do not relate to the peculiar rules of equity to which we have referred, and which require special proofs, is clear, because, in the particular case cited, they applied against a patentee who was himself claiming priority not shown in his application for his patent.

It is true that it may be said, as was observed by this court in The Metamora, 144 Fed. 936, 941, that determining the preponderance of a case "includes weighing the probabilities." The topic, however, was admirably explained by Mr. Justice Walton, one of the most experienced of all the New England judges, in Decker v. Somerset Insurance Company, 66 Me. 406, 408, 409. In Maine the law is settled that, although the pleadings in a civil action allege specifically all the elements

of a crime, they are required to be maintained, like the usual allegations in civil cases, by only a preponderance. Nevertheless, with reference to defenses of this character, Mr. Justice Walton, in the opinion referred to, observed as follows:

"To create a preponderance of evidence, the evidence must be sufficient to overcome the opposing presumptions as well as the opposing evidence. Presumptions, like probabilities, are of different degrees of strength. To overcome a strong presumption requires more evidence than to overcome a weak one. To fasten upon a man a very heinous or repulsive act requires stronger proof that to fasten upon him an indifferent act, or one in accordance with his known inclinations."

Applying these practical rules to the case before us, we find, first of all, that, by the explicit requirements of the bankruptcy statutes, the specifications relied on by the objecting creditors directly charge the bankrupt with criminal offenses of so serious a character that each of them is punishable by imprisonment with a maximum of two years; and the same is so denounced that no alternative of a fine is permitted. The alleged concealment must have been made knowingly and fraudulently; and, according to the practical construction of the statute, it is settled that the alleged false oath must contain all the elements involved in perjury at common law, namely, an intentional untruth in a matter material to an issue which is itself material. Under these circumstances, all agree that the burden of proof rests on the objecting creditors, but the gravamen of proof is somewhat variously stated. In Re Leslie (D. C.) 119 Fed. 406, and in Re Dauchy (D. C.) 122 Fed. 688, it is said in a general way that a preponderance of satisfactory evidence is sufficient. These cases were both in the District Court. On the other hand, in Re Wetmore, 99 Fed. 703, 704, also in the District Court, it was said that on these issues "the burden is upon the exceptant to prove the allegation of fraud to the satisfaction of the court." In Re Howden, 111 Fed. 723, 725, also in the District Court, but by Judge Coxe, a judge of very extensive experience, the opinion said:

"The authorities are unanimous in holding that the burden is upon the opposing creditor to prove his objection, not necessarily beyond a reasonable doubt, but by clear and convincing testimony."

Also in Re McGurn, 102 Fed. 743, 745, Judge Hawley, also a district judge of very marked ability and experience, declared as follows:

"The burden of proof rests upon the opposing creditors to establish their charge against the petitioner by satisfactory evidence."

A like expression is found in Re Corn (D. C.) 106 Fed. 143, 144.

It is evident that these expressions of the various district judges which require that, on the issue before us, the evidence should be clear, or satisfactory, or convincing, were not merely incidental, but were deliberate. Collier on Bankruptcy (5th Ed.) 905, at page 174, sums up, with reference to the proof required on specifications of the character before us, as follows:

"Proof must be strict and convincing, but not necessarily to the limit required in proving a crime."

The only authority, however, which is at all binding upon us is in the expressions of Judge Wallace in the opinion rendered in behalf of

the Circuit Court of Appeals for the Second Circuit in Re Gaylord, 112 Fed. 668, 669, 670, 50 C. C. A. 415, 416, already referred to. With regard to objections to specifications alleging a false oath, the offense is described by him as perjury, indicating that all the elements are required to constitute the offense which are required with reference to perjury at common law; and thereafterwards it is said as follows:

"The testimony of the bankrupt throughout his examination at the first meeting of the creditors was so evasive and disingenuous as to discredit his truthfulness, but his discharge cannot be defeated upon such a consideration. It is incumbent upon the opposing creditor to establish satisfactorily that the particular statements of which perjury is predicated were false."

These citations are in entire harmony with the philosophy of what was said by Mr. Justice Walton in Decker v. Somerset Insurance Co., already quoted. When a person is charged with all the elements which constitute a heinous crime, although it be only on a civil issue, it shocks the judicial mind to refuse to give him the benefit of the usual presumption of innocence unless the adverse proofs are so far satisfactory as to be convincing.

With reference to the allegation that the bankrupt concealed his assets, described to have been cash to the extent of at least $7,450, it is to be observed, first of all, that there is no evidence in the record identifying, even by suggestion or by any ear-marks whatever, any assets retained by the bankrupt from his trustee, or pointing out any property under his control after the surrender of his assets. The case fails in that respect. It turns upon deductions from computations based on the bankrupt's account books, checks, and papers of various kinds. While, for a period of two months preceding the filing of the petition in bankruptcy, these deductions failed to account for assets to the extent of several thousand dollars, the same methods and sources of computation showed for the next preceding two months an equal balance the other way. Taking the whole together, there would be no deficiency to be accounted for; but we do not rely on that fact as containing in itself a direct answer to the computations which the creditors bring to our attention. We rely on it simply because it leads absolutely to the conclusion that the methods insisted on by the creditors are unsatisfactory. The record, indeed, shows that a deficiency fully as great as appears in the bankrupt's schedules might well have been expected from his inexperience, the reckless methods with which he carried on his business, and the extravagant expenditures within and without the lines of his dealings. So far from the record sustaining by a preponderance of evidence, in any way in which that expression may be construed, the proposition that there is a deficiency of assets unaccounted for, it strikes us as sustaining on the whole the probability that there is no such deficiency.

Coming now to the alleged false oaths in the course of the examination of the bankrupt, it is, of course, necessary that we should first state some positive proposition upon which the proofs bear, which, as we have already observed, the specifications fail to do. There should be noted in this connection the practical rule stated by Judge Wallace, in what we have cited from In re Gaylord, namely, that "it is not sufficient that the testimony of the bankrupt throughout his examination was so

evasive and disingenuous as to discredit its truthfulness." It is not a question of the general truthfulness of the bankrupt, but a question as to some specific matter which can be framed into an issue, material to the bankruptcy.

It is to be borne in mind that the alleged false oaths were in the course of a long examination, in which the bankrupt was pressed to explain a theoretical deficiency which it is not shown existed. It is, indeed, urged upon us, as was remarked in the opinion of the learned judge of the District Court in this case, that "the burden is on the bankrupt to account for his disposition of so large an amount as $7,328.11, received in cash by him within a short time before his bankruptcy." We ought to add that, in this connection, the learned district judge also observed that the circumstances attending the bankruptcy made it especially and peculiarly incumbent upon the bankrupt to explain to a reasonable degree of certainty what became of this amount. The case in behalf of the creditors was presented throughout on this theory. The bankrupt was in the position of being forced to account for a deficiency which did not exist so far as shown by this record. Starting with erroneous premises and compelling him to meet an erroneous hypothesis, it might be expected that the examination would result in confused statements, unless the bankrupt was possessed of a good amount of firmness of character and of ability in meeting the erroneous issues presented to him. The case on the part of the creditors seems to have started from this erroneous beginning, and to have been erroneously pressed against the bankrupt as though the burden was on him throughout, and in no part on the creditors.

The specifications relating to this part of the case are so voluminous and indefinite, and the issues which are sought to be raised are so numerous, that any attempt to deal with the record in detail in this opinion would exhaust the patience of all concerned, and result in no advantage to any one. We will, therefore, take for this purpose only one proposition. In the bankrupt's attempted explanation how his supposed deficiency arose, he stated that he had been dealing with quite a number of bucket shops. The learned district judge said:

"Evidence was introduced to contradict these statements, and it is claimed that some of them have been shown to be distinctly false. I think this claim is sustained as to at least one of them."

This one was an alleged loss of $700 at a place called Bucklin's. In this connection the learned district judge said that he was satisfied that, in reference to two other bucket shops, the bankrupt made false statements; but he added:

"Their materiality in the proceedings is not so clear as the materiality of his testimony about the loss of the $700 at Bucklin's."

We think we may safely say that he relied on this specific topic of Bucklin's as the one in which, according to his views, the case was most clearly made against the bankrupt; and the careful examination which we have given to the record leads us, also, to the conclusion that, in the whole line of attack by the creditors, this point was the most strongly supported, and to the further conclusion that, in selecting this as the

only one whose details we will undertake to examine in this opinion, we do the creditors no injustice.

It is urged by the creditors that the examination of the bankrupt in reference to the losses in bucket shops occurred within a few months of his bankruptcy, and therefore within a very few months after the transactions, so that it is urged that the bankrupt ought well to have remembered what occurred. But it is to be borne in mind that neither the bankrupt nor the witness who testified against him as to his losses at Bucklin's produced any book or original memorandum to sustain his evidence, nor anything whatever to refresh his recollection. The matter was introduced in the bankrupt's examination by the trustee as follows: The bankrupt having first explained that he was 26 years old and a jeweler by trade, the trustee took up the bankrupt's books, found an item of November 1, 1901, "cash $1000," and inquired about it. The bankrupt replied as follows:

"When I was away on my trip, it cost me more than $500 [meaning his wedding trip], and part of this, while I was away, I borrowed some and paid it back. It was in all about $250 or $300. And the $700; I think some of them went up to Mr. Bucklin's."

This was the only thing said by him of his own voluntary testimony, and the fact that some of the $700 went to Bucklin's is not questioned. Then the following occurred, in which the trustee distinctly led the bankrupt:

"Q. You lost some of this $700 at Bucklin's? A. Yes, sir.
"Q. Most of it? A. Pretty near.
"Q. What did you buy at Bucklin's? A. I bought Brooklyn Rapid Transit."

Subsequently, in his examination in April, 1904, on other questions put by the trustee, he answered as follows:

"Q. How much money did you lose at Bucklin's place during that period? A. I played with a man named Freefield at Bucklin's.
"Q. How much money did you lose there? A. I think, $700. I am not sure. I can't just remember.
"Q. Did you trade there in your own name? A. I don't think I did. I think I put in probably two trades in my own name, and then used these other names.
"Q. That is, during September, October, and November, 1903? A. Yes.
"Q. You think you put in two trades in your own name and then used some other? A. Yes; I am not sure.
"Q. Did you do all the trading yourself? A. No."

It seems to us that this, so far from indicating any intention to falsify to the extent of testifying untruthfully that he lost $700 at Bucklin's or any other definite amount, should be taken altogether as indicating a lack of recollection, and certainly a lack of definite statement with reference to anything that occurred there. We think we might leave the issue with this proposition. However, the trustee in November, 1904, a little more than a year after the transactions occurred, examined one Freefield, who testified that all the trading which the bankrupt did at Bucklin's during the time Bucklin was open involved a loss of only $120, which occurred through Bucklin failing the day after the bankrupt put up that sum as margins, and that the bankrupt did not trade at Bucklin's until the day before the failure. He also stated the

conversation which was had when the bankrupt and himself met after the failure, of a somewhat peculiar character, which might well impress on his mind the $120 transaction. On cross-examination, he said Bucklin was open only six weeks, that he (the witness) was there every day, and that the bankrupt was there probably an average of once a week, or six times, although he was not positive with reference to this. Of course, whether he traded in other names than his own Freefield might not know. Freefield was Bucklin's manager during the six weeks that the place was open. At the time he was testifying he was in the real estate business.

As we have already said, Freefield's testimony was based on the mere personal recollection of what happened in the short history of a bucket shop which was open only six weeks, and marked undoubtedly by the usual series of hasty and disconnected transactions which may be supposed to occur in the course of the gambling operations which there took place. If this were a criminal proceeding, the court, in accordance with the usual rule of one witness with unsupported testimony against that of another, would direct the jury that each was neutralized and that acquittal must follow. Although this is not a criminal proceeding, it strikes us that such is the result with the testimony of these two witnesses under the circumstances and the characteristics we have explained. Indeed, this is so clear to the practical legal mind that it does not seem necessary for us to do more than to state the facts and the conclusion to which they have brought us.

The learned judge of the District Court evidently examined this case with great care, and from his standpoint, as we have to some extent explained it, he might well have come to the conclusion that the bankrupt's discharge should be refused. From our standpoint, however, we are of the opinion that the record does not present proofs sufficiently weighty to satisfy a court that the creditors' specifications are maintained. We reach this conclusion without the necessity of applying definitely the propositions which we have considered with reference to the amount of proof required to sustain specifications of the character before us. The record suggests too strongly that the bankrupt was only an incompetent and careless witness, pressed and confused by an examination under the circumstances we have described, rather than a willful perjurer, to permit us to find that he was, in fact, the latter. Such a finding is, of course, essential to enable us to sustain any portion of the specifications which charge false oaths in the course of his examination, even if some parts thereof should be in fact untrue. Moreover, as we have shown directly with reference to the charge that the bankrupt had concealed property from his trustee, and, by illustration, with reference to the issues of alleged false oaths, there is not such a preponderance as sustains the creditors in any view of the amount and weight of proofs to be furnished by them. Consequently, it is our opinion that, on this record, the bankrupt's discharge should not be refused.

The judgment of the District Court is reversed; the case is remanded to that court with directions to grant the bankrupt his discharge as prayed for; and the appellant recovers his costs of appeal.

NOTE.—The following is the opinion of Dodge, District Judge, on the bankrupt's application for a discharge:

DODGE, District Judge. The referee to whom these specifications were referred on July 13, 1905, has reported that they are not sustained. With his report, and as part thereof, is submitted the record of testimony upon which the case was heard before him. The specifications relied on before him charge false oaths in relation to the bankruptcy proceedings, fraudulent concealment of assets within four months of bankruptcy, and fraudulent concealment of assets from the trustee in bankruptcy. A specification charging failure to keep books, with intent to conceal the bankrupt's financial condition, was not relied on before the referee. Adjudication was made in the case December 9, 1903, upon the bankrupt's own petition.

The greater part of the evidence before the referee related to the bankrupt's financial transactions after October 1, 1903, and before his bankruptcy—a period of a little more than two months. These transactions were made the particular subject of inquiry by the trustee, and are principally relied on in support of his specifications by the objecting creditor. It appears by the bankrupt's books, and it is not disputed, that within the period referred to he received $22,415.55 in all, in cash for goods sold. By his books or by other evidence in the case the disposition of $15,087 44 in all during the same period is specifically accounted for. The receipts and payments during October, 1903, and those from November 1st to the filing of the petition have been separately stated in the referee's report. They make in all the total amounts above given. There remains $7,328.11 in all of the cash received as above, the disposition of which is not shown by the bankrupt's books, and so far as it is shown at all is shown only by the bankrupt's oral statements under examination, or by the evidence of witnesses called by him in support of those statements.

The burden is on the bankrupt to account for his disposition of so large an amount as $7,328.11 received in cash by him within so short a time before his bankruptcy, and forming so large a proportion of the total amount of cash shown to have gone into his hands within the same period. There are also circumstances attending his bankruptcy, his receipt of the total amount of cash referred to, and his dealings therewith, which in my opinion make it especially and peculiarly incumbent upon him to explain with a reasonable degree of certainty what has become of this money. These are as follows:

(1) The bankrupt had been in business only about two years. Beginning business in November, 1901, with about $5,000 worth of assets and no liabilities, he was bankrupt early in December, 1903, his liabilities then amounting to about $40,000, against assets scheduled by him at $19,000, but which proved to be worth only about $5,000. Until September, 1903, he was unmarried, and with no one dependent upon him. The evidence does not show that he sustained losses to any great amount in the regular and legitimate course of his business.

(2) The bankrupt's cash receipts for goods sold during the period immediately before his bankruptcy, which has been referred to, were nearly twice as much as the cash receipts for goods sold within any other period of equal length during the time he had done business. The sales of goods made by him during this very period were often made, according to his own testimony, at large discounts from the regular prices.

(3) The referee has found that "much of the uncertainty of the case is explicable alone upon the theory that the debtor did not keep a technical or scientific set of books," and he has set forth facts which show beyond question that the method of bookkeeping followed was throughout extremely inadequate and incomplete. But although this is true, and although the objecting creditor has not pressed the charge that the insufficiency of the bookkeeping was with intent to conceal the bankrupt's financial condition, it appears that the books do purport to show, often in considerable detail, what became of a great part of the cash received during the period in question; and this fact in my opinion renders a satisfactory explanation as to the remainder the more necessary to be supplied by the bankrupt himself.

The explanation which has been accepted by the referee as sufficient, viz, that the bankrupt borrowed money from various persons either before or during the period referred to, to the amount of $6,600, and repaid these loans out

of the cash received after October 1, 1903, is, of course, if properly sustained by evidence, a satisfactory explanation so far as it goes, and leaves unaccounted for only about $700 of the cash so received. The bankrupt's books and vouchers contain nothing which helps to prove that there were such loans, except that it appears by them, as the referee states, that in one or two months prior to October 1st the bankrupt paid out more money than he received. They do not show any repayments of borrowed money after October 1st not included in the total expenditure of $15,087.44 after that date already credited to the bankrupt. The bankrupt has attempted in his evidence to prove that there were such payments, although there are neither book entries nor vouchers to prove it, and the question is whether his attempted proof is sufficient to sustain the burden which rests upon him in view of all the circumstances above referred to.

The record shows that the bankrupt's examination was begun on December 28, 1903, and continued on January 30, March 10, and April 12, 1904. It was resumed on November 2, 1904, and concluded March 23, 1905. Early in that part of his examination, had between December, 1903, and April, 1904, his attention was fully called to the fact that he was required to give an account of the disposition made by him of that part of the cash received after October 1, 1903, which was not accounted for by his books. If the most of this money was used in paying loans, as is claimed, the transactions were then so recent that it does not seem to me unreasonable to expect from him an account of those loans and of their repayment, reasonably clear and definite as to the persons to whom such loans were paid, and making some approach to accuracy as regards dates and amounts. His memory should in my opinion, have been sufficient to enable him to do as much as this at the time he was first examined upon the subject. That he had omitted to enter the transactions in his books ought to have impressed them more rather than less upon his recollection. He was at any rate bound to try his best to give such an account, to disclose fully and frankly his whole knowledge and best recollection, and to do so without any attempt whatever to equivocate or conceal.

The evidence which he has actually given, as shown by the record, has seemed to me to fall much below what it was proper to expect from him both in candor and in accuracy. I am compelled to agree with the trustee's preliminary report filed June 30, 1905, in its statements that the bankrupt showed himself, generally speaking, to be unsatisfactory and unreliable as a witness, and that his answers were often misleading and disingenuous. Names of persons to whom loans were repaid, and the amounts paid to each, which should have been forthcoming when first inquired about early in the examination, were not given until the examination had reached its later stages, after repeated adjournments. Nor were the dates of the payments then testified to with any accuracy, and the witness avoided, as much as he could, committing himself to anything definite about them. As to the names and amounts finally testified to as indebtedness paid after October 1, viz, $1,000 to Wyner, $1,100 to Berkman, $2,000 to Samuels, $500 to Schlanger, $600 to Rothenberg, $1,200 to Rubinovitz, and $1,500 to Weil, I agree with the trustee that the payments to Wyner and Weil had been included in the total of $15,087.44 for which the bankrupt was not being asked to account, and they were therefore not included in the $7,328.11 which needed explanation. To assist in proving the alleged payments to Schlanger, Rothenberg, and Rubinovitz, each of those persons was called as a witness. Yet their evidence, taken in connection with the bankrupt's, leaves the question whether he really paid them those amounts after October 1, 1903, subject to much more doubt and uncertainty than should attend the proof of facts so simple in character. The payment to Rubinovitz of $1,200 is stated by him and by the bankrupt to have been the payment of two notes held by him, one of $700 the other of $500, but neither of them is willing to be more definite as to the time of payment than that it was in October or November. The evidence as to the Schlanger and Rothenberg payments seems to me still less definite and satisfactory. If Rothenberg's evidence is relied on, $600 was not paid to him, as the bankrupt testified, but to Rubinovitz for him, as the referee has found in his report. There was no attempt to get Samuels' evidence, though Samuels was in New York. The prevailing reluctance of the bankrupt and of the witnesses called by him to commit them-

selves to definite statements regarding dates and amounts is not easy to understand, if the facts were really as claimed. So strongly am I impressed, upon the whole evidence, with the view that the bankrupt has not accounted with entire honesty and to the best of his knowledge for the $7,328.11 in question that I should be much inclined to hold, without any regard to his evidence about alleged stock speculations more fully considered below, that he has not sustained the· burden which is upon him so to account, and that the court is therefore warranted in inferring a fraudulent concealment of the amount to be accounted for, or some part thereof. Similar inferences were drawn upon similar grounds in Re Meyers (D. C.) 96 Fed. 408, Re Finkelstein (D. C.) 101 Fed. 418, Re Mendelsohn (D. C.) 102 Fed. 119.

Much of the record is taken up with evidence regarding losses claimed by the bankrupt to have been sustained through speculation in places of the kind often spoken of as "bucket shops." The bankrupt's desire appears to be that it should be inferred from his evidence that enough was lost by him in such speculations, after October 1, 1903, to account for whatever the court may hold to have been insufficiently accounted for otherwise. In answer to inquiries by the trustee the bankrupt, though with obvious reluctance, made statements as to the places in which he lost money and the amount lost in each. Evidence was then introduced to contradict these statements, and it is claimed that some of them have been shown to be distinctly false. I think this claim is sustained as to at least one of them. The bankrupt testified that he lost "pretty near" $700 at a place called Bucklin's, on School street, by buying stocks there, paying the money called for by the transaction, and finding that the place had failed and was closed up when he next visited it. One Freefield, manager of the place in question, who, upon the bankrupt's own evidence, knew about the transaction, testified that the bankrupt did buy stocks there on the day before the place failed and closed up, that he had no transactions there except on the occasion testified to, and that the amount thereby lost by him was $120. The bankrupt's statement under oath that pretty near $700 was lost by him in speculation carried on at Bucklin's is, in my opinion, clearly shown to be a false oath in relation to these proceedings. It was made as part of his attempt to sustain the burden of accounting for the disposition of the cash in question, and was therefore material in the proceedings. The bankrupt testified that he had stock transactions in a place in the McDonald Building, on Winter street, and it is shown by evidence of the janitor of that building that there was no such place in the building during the time in question. He has not testified, however, to any definite amount of loss sustained by his transactions there. The bankrupt testified that in two places operated by the Federal Stock & Grain Company, one on School street, the other on the corner of Devonshire and Water streets, he lost $2,000 in October and November, 1903. It is shown that the Federal Stock & Grain Company·had no office at the corner of Devonshire and Water streets until after January 8, 1904. In these two latter instances I am satisfied that the bankrupt made false statements under oath, but their materiality in the proceedings is not so clear as is the materiality of his testimony to a loss of nearly $700 at Bucklin's.

The bankrupt's evidence in general regarding his alleged losses through stock speculation I consider even more misleading and disingenuous than his evidence regarding the payment of alleged loans. Other places were mentioned than those above referred to as places in which he lost money after October 1, 1903. He undertook during his examination, on March 10, 1904, to ascertain by inquiry at each what amount he did actually lose in each, but his examination was closed more than a year later without any attempt on his part to perform this undertaking. I am unable, in view of the character of his evidence on this subject and of the contradictory evidence, to place any reliance upon his testimony regarding such losses, or to give it any weight in the accounting which is due from him as to the $7,328.11. The one false oath which I find to be established·would in itself prevent his discharge, but its effect is also to confirm the view taken above of his evidence in general, and to oblige me to hold, notwithstanding the opposite result reached by the referee. from which I differ with reluctance, that the specifications of objection relied on should be sustained.

The discharge is refused.