## In re JACOBS & VERSTANDIG.

(District Court, D. Oregon. October 12, 1906.)

### No. 28.

**1. BANKRUPTCY—DISCHARGE—CONCEALMENT OF PROPERTY.**

A fraudulent concealment of property by a bankrupt from his trustee to justify the refusal of his discharge, under Bankr. Act July 1, 1898, c. 541, §§ 14b (1) and 29b (1), 30 Stat. 550, 554 [U. S. Comp. St. 1901, pp. 3427, 3433], cannot be predicated of acts committed prior to the passage of the bankruptcy act, or even prior to the adjudication; but, if a concealment of goods or money then initiated with intent to defraud creditors is continued after the bankruptcy, it is a concealment from the trustee within the statute.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, § 735.]

**2. SAME.**

Where the stock of goods of a firm of retail merchants, a few months prior to their bankruptcy, together with the goods afterward bought, exceeded in value the goods and accounts as inventoried by the trustee by more than $15,000, while the amount paid to creditors during the same time was less than $1,500, and the remaining value is wholly unaccounted for, it is a fair inference that the bankrupts converted the goods into money and fraudulently and knowingly concealed and continued to conceal the same, and the facts justify a refusal of their discharge under Bankr. Act July 1, 1898, c. 541, § 14b (1), 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427].

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, § 735.]

In Bankruptcy. On application for discharge.

Ed. Mendenhall and A. R. Mendenhall, for bankrupts.
Bauer & Greene, for objecting creditors.

WOLVERTON, District Judge. Heretofore, on August 6, 1904, the referee in bankruptcy made findings, and a recommendation based thereon, that the bankrupts were entitled to their discharge. Certain creditors, deeming the findings unsupported by the evidence, have moved the court to set them aside and to deny the recommendation. The specifications in opposition to the discharge are numerous; but, in the view I take of the matter, it will be necessary to consider only the sixth of the first charge, which is, in effect, that the bankrupts did, knowingly and fraudulently, while bankrupts, conceal from the trustee property belonging to their estate, to wit, a sum of money, being the proceeds received by them from the sales of goods, wares, and merchandise, and from the collection of accounts, claims, and demands, in their business at Toledo, between about June 1, 1898, and January, 1899. In reality this specification, being general in its scope, going to the conduct of the principal business, comprises, in substance and effect, the five preceding, and questions the bona fides of the bankrupts in accounting for all sums received by them in the management of their business intervening the dates designated.

The firm embarked in business at Toledo, Wash., with a branch house at Portland, Or., in the summer of 1895, on a capital of $4,000; Jacobs contributing $2,500, cash and merchandise, and Verstandig the remaining $1,500, mostly in cash. According to Jacobs, the firm did

well up to the spring of 1898—did a fairly profitable business—but commenced to lose money about the beginning of March. Verstandig says they lost money from January 1, 1898; but, from an inventory which he testifies was made of the stock on that date, it appears that they had accumulated $12,000 in merchandise, and in notes and accounts considered good $500, with liabilities on stock purchases of $4,500, and thus that they had doubled their capital. It is explained that their losses were entirely upon produce purchased, such as oats, hay, potatoes, and the like, from their customers; but of their dealings in this line they kept no books of account whatever, and were wholly unable to specify any particular losses they had sustained; except that Verstandig testifies that they lost about $5 per ton on 40 or 50 tons of hay shipped to San Francisco, and $409 on a lot of potatoes they were unable to get to market at the proper time. They seem to have conducted four stores in Toledo. In March or April, 1898, they opened another store at Castle Rock, supplying it with goods from Toledo, with D. S. Joelsohn, Jacobs' son-in-law, in charge. They conducted it in that manner for about two months, when they sold to Mrs. Joelsohn, Jacobs' daughter. It is shown that Mrs. Joelsohn purchased with money furnished by her mother, the consideration being $800, and that the proceeds were divided between Jacobs and Verstandig; each getting one-half, or $400. No account was kept of the amount of goods taken from the store at Toledo to supply the one at Castle Rock, nor does there seem to have been any inventory taken of the stock when sold. Subsequently, Mrs. Joelsohn and the Toledo stores exchanged goods in limited quantities for mutual accommodation. Some time in September, 1898, the firm opened a store at Olequa, Wash., near the hop-yards. Verstandig testifies early in his examination that the firm took some $4,000 or $5,000 worth of goods out there, that they realized about $500 from sales, and that the balance of the stock was carried back to Toledo. Upon a subsequent examination he stated that the amount of goods sent out was from $1,000 to $1,500 in value. There was no account, however, kept of this project, as it respects the amount of goods shipped, sold, or returned. The clerks in charge sold for cash account, receiving for purchases money or hop checks, the equivalent of cash. In the latter part of September, the firm opened still another store at Seattle, Wash. This they supplied with goods from their stock at Toledo, and others purchased from jobbers and intercepted at Winlock and carried on to Seattle. This enterprise was conducted until early in December, when the stock remaining undisposed of was reshipped to Toledo. Jacobs was himself in charge at Seattle, and testifies that the only money he accounted for to the firm arising from the business was $400, which he paid to Verstandig. He says further that the venture was not profitable, the sales being light and the expenses heavy. He was unable, however, to state what the expenses were, except to say they ran from $300 to $600. Verstandig testifies again, as to this, that the amount of goods shipped to Seattle was from $3,000 to $4,000 in value; but in his later examination he declares that, according to his estimate, it was from $1,000 to $1,500. There is some attempt to determine the value of the goods shipped and reshipped

from the waybills and shipping receipts of the transportation companies, but the data do not furnish sufficient basis for reliable deduction as to that. Besides these several ventures, the firm had a store for a time at Portland, but there is no book account whatever of the business transacted there. This gives a general idea of where, and somewhat how, the business was conducted. It is unnecessary to allude to matters more specifically.

On August 1, 1898, Verstandig gave to L. C. Wachsmuth & Co., of Chicago, for the purpose of obtaining credit, a statement of the firm's resources and liabilities, in substance, as follows:

| | |
|---|---|
| Merchandise on hand, cash value January 1, 1898 | $12,000 00 |
| Amount of book accounts and notes considered good | 500 00 |
| Total | $12,500 00 |
| Owing for merchandise, open account | $ 1,100 00 |
| Other money | 300 00 |
| Total | $ 1,400 00 |
| Annual sales | $20,000 00 |

In connection with this statement, the firm writes:

"That outside of stock in merchandise we have about $1,500 worth of produce on hand, but we could not give you exact statement of stock on hand only from inventory taken Jany. 1st, 1898."

This statement is one of three made all in a comparatively short period of time, and all for the purpose of sustaining and procuring credit. The first was on July 20, 1898, and shows:

| | |
|---|---|
| Stock | $11,000 00 |
| Cash on hand | 500 00 |
| Good accounts | 500 00 |
| Stock at Portland | 2,000 00 |
| Total | $14,000 00 |
| Indebtedness | $ 2,300 00 |

The third, being of date August 20th, shows:

| | |
|---|---|
| Stock | $12,000 00 |
| Notes and accounts | 1,700 00 |
| Total | $13,700 00 |
| Indebtedness | $ 1,725 00 |

These statements, as compared one with another, are consistent, and indicate that the business was conducted regularly. A careful estimate of subsequent purchases by the firm, of wholesalers and jobbers, which is based upon data contained in a book kept by Verstandig personally, shows that they procured additional goods prior to their failure of the value of $12,086.27. I may say the failure dates from about December 13, 1898, when their main store at Toledo was attached. Within the same period of time the book shows amounts paid out aggregating $1,392.90 only; so that by adding stock on hand August 1st, namely $12,000, to the subsequent purchases, $12,086.27, we have an aggregate of $24,086.27; and deducting amount disbursed, to wit, $1,392.90, leaves $22,693.37 of stock alone to be accounted for, omitting all reference to other property, which is of no significance in the

investigation. Now, the inventory of the trustee, taken at cost mark, shows merchandise $7,353.59. To this add accounts as per the firm's own schedule, $1,041.44, and we have $8,395.03, which deduct from the above, and we find a discrepancy of $14,298.34. This is a very large sum, and wholly unaccounted for. Verstandig in his testimony discredits in a manner the inventory of January 1, 1898, by saying it was taken by his clerk, and the several statements made by himself to their wholesale dealers, asserting that they were made from estimates only, and for the purpose of obtaining credit, leaving the inference that they were swelled so as to enlarge the apparent resources of the firm. But, if we allow only $4,000, the original capital, for stock on hand at the time of the statement of August 1st, there will still remain a discrepancy of $6,298.34—a deficit occurring within less than 4½ months, and altogether unexplained. The alleged losses on produce do not explain it, for these occurred in the spring, prior to the time of the statement of August 1st; and then the $1,500 worth of produce mentioned in the letter of that date is not taken into account at all. There might have been other disbursements of cash—probably were—but no account is recorded of them. The firm had a system of giving duebills to persons from whom they purchased produce, paying these by store account or by cash, as convenience permitted, thus taking up the paper without making any record thereof. But these accounts could not have been large. Indeed, upon persistent inquiry, Verstandig was unable to give the names of any considerable number of persons who ever held such paper. Another item worthy of mention is that Verstandig testifies that he paid the $400, received from Jacobs as the proceeds of the Seattle venture, to Collins, whom he says he owed for borrowed money. But this does not appear upon the records. The account with Collins, with whom there appears to have been one kept, does not show anything of the transaction. This is about the only explanation going to reduce the amount of the discrepancy. The firm ventures an explanation that they increased their stock in anticipation of a large business in the hopyards, and, finding they were disappointed in this, sought to reduce it by selling in Seattle, and thus to enable them to meet the demands of their creditors. But it appears that they supplied goods to the Seattle store, not only from Toledo, but directly from the wholesale dealers, thus refuting the sincerity of the explanation. And, again, it appears that the proceeds of the sale of the store at Castle Rock were divided between the parties, without any idea of paying them to the creditors of the firm, where they should have gone in the ordinary course of business. In connection with these facts, it should be further remarked that the testimony of both members of the firm was very unsatisfactory. The memory of each was bad, and they could give no definite statement touching the current transactions, or of conditions at any particular time, and left the affairs, not altogether without purpose, as I am convinced, in an uncertain and indefinite shape, so that the true condition should not be known.

Are the members of the firm entitled to a discharge upon such a record? The rule undoubtedly is that the discharge cannot be with-

held on account of any concealment of property or funds by the bankrupts prior to the time the bankruptcy act became operative, which was July 1, 1898; otherwise, the law would be retroactive. In re Webb (D. C.) 98 Fed. 404; In re Moore, Fed. Cas. No. 9,751. The data, however, forming the basis for present consideration are of conditions obtaining and arising subsequent to the enactment. What matters prior to that date have been alluded to in the statement, relative to the proofs, were for the purpose of showing the manner in which the business of the firm was conducted. It is necessary to show that the concealment was of property to which the trustee is entitled, and it must have been made knowingly and fraudulently by the bankrupts while such; that is, after they were adjudicated bankrupts. Subdivision 1, § 14b, read in connection with section 29b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 550, 554 [U. S. Comp. St. 1901, pp. 3427, 3433]); In re Quackenbush (D. C.) 102 Fed. 282. The word "concealed" employed in this connection is sufficiently elastic in its signification to comprise a "continuing concealment." Thus, if a bankrupt has disposed of property belonging to him, prior to the adjudication, and has the proceeds thereof in his possession or within his authority to use and appropriate subsequently, there is a continuing concealment, for which he is amenable to the law, although the fact of concealment by intent and purpose took place while he was not a bankrupt. In re Quackenbush, supra; In re Hussman, 12 Fed. Cas. No. 6,951; In re Ablowich et al. (D. C.) 99 Fed. 81; In re Welch, 100 (D. C.) Fed. 65; In re Mendelsohn (D. C.) 102 Fed. 119; In re Hoffmann (D. C.) 102 Fed. 979; In re Bemis (D. C.) 104 Fed. 672.

Now, considering the entire testimony, a resumé of which, or of such as is material to the present controversy, is contained in the foregoing statement, it is impossible to draw any inference other than that the bankrupts concealed a large amount of the assets of the firm. Presumably such assets were in the form of money, as no other property is to be found in their possession. Having the money prior to the adjudication, they must have had it since, and have it now in legal contemplation. The wide discrepancy between the assets they had on hand August 1, 1898, added to those they procured subsequently, and those they had on hand according to the inventory of the trustee, proves this; and, while it is possible that they yet have merchandise of their stock while in business, yet the most reasonable inference from the manner of conducting their business in the latter days of their career in that line is that they have money to a considerable amount, the proceeds of such merchandise. They were doing their best to reduce their stock to cash, but have failed utterly to account for the proceeds. As was said by Brown, District Judge, in Re Mendelsohn, supra:

"In order to secure any effective administration of the law in bankruptcy, it is indispensable to hold bankrupts to the performance of the duties imposed upon them by the act, and to deny them a discharge where the only reasonable inference from the testimony and exhibits made is a concealment of assets and intentional nonproduction of books, which might otherwise account for their disappearance."

In the case at bar the bankrupts have produced what books they had, but they were grossly derelict in failing to keep intelligible books

147 F.—51

of account of their ordinary business, so as to show the state of their assets. I am sure that any intelligent jury of citizens would not fail to find a concealment of money by the bankrupts, while such, under the evidence and conditions here present. Several of the cases above cited are similar to this one. And in addition thereto, as very apt, I cite further the case In re O'Gara (D. C.) 97 Fed. 932, decided by my predecessor.

The discharge will therefore be denied.