## GARRY v. JEFFERSON BANK.

### (Circuit Court of Appeals, Fifth Circuit. April 11, 1911.)

### No. 2,137.

1. BANKRUPTCY (§ 414*)—APPLICATION FOR DISCHARGE—EVIDENCE.

While the ordinary rules of evidence control in the contest of a bankrupt's discharge, the proof must be strict and convincing to justify a refusal of the bankrupt's application, though not necessarily such as to establish the objections beyond a reasonable doubt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 720–722; Dec. Dig. § 414.*]

2. BANKRUPTCY (§ 414*)—APPLICATION FOR DISCHARGE—OBJECTIONS—EVIDENCE.

On objections to a bankrupt's discharge, evidence *held* insufficient to sustain a finding that the bankrupt failed to keep books of account, or that he concealed or destroyed them so as to prevent his financial condition from being ascertained.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 722; Dec. Dig. § 414.*]

Appeal from the District Court of the United States for the Southern Division of the Northern District of Alabama.

In the matter of bankruptcy proceedings of Robert Garry. From a decree denying a petition for discharge in bankruptcy on the objection of the Jefferson Bank, the bankrupt appeals. Reversed.

This is an appeal by Robert Garry from a decree of the District Court denying his discharge in bankruptcy, upon opposition made by the Jefferson Bank, a creditor.

Robert Garry & Co., a partnership composed of Robert Garry and J. Gudel, doing a wholesale notion business in Birmingham, Ala., was adjudged a bankrupt on an involuntary petition in May, 1909. The firm had been engaged in business for several years. In 1905 Garry, who, up to that time, had resided in Birmingham, removed to New York, leaving the Birmingham business in charge of his partner, Gudel. In New York Garry formed a partnership with one Pearlman, and engaged in the wholesale dress goods business under the firm name of Robert Garry & Co.; there being two firms doing business under this name at the same time, the New York firm composed of Garry and Pearlman, and the Birmingham firm composed of Garry and Gudel. The firms had no mutual transactions. The New York firm became indebted to the Jefferson Bank in 1908 in the sum of $5,000. The firm was dissolved in November, 1908, Pearlman retiring; and Garry proceeded to wind up the business, which he concluded, and moved to Birmingham on February 22, 1909.

Garry applied for his discharge in December, 1909. The Jefferson Bank appeared and opposed the discharge upon many grounds. Reference to a special master was had, and report made sustaining a number of specifications of opposition, to wit, the first, fifth, sixth, and seventh, as follows:

"(1) Upon information and belief, the said Robert Garry wrongfully, fraudulently, willfully, and knowingly concealed, while a bankrupt, from his trustee in bankruptcy, the sum of $15,000, said moneys belonging to the bankrupt estate, which the said bankrupt had reserved and retained for himself, being moneys withdrawn from the firm of Robert Garry & Co., or the proceeds or avails of the property belonging to the said bankrupt, or that the same is now being held by divers relatives or friends of the said Robert Garry, a member of the firm of Robert Garry & Co., the above-named bankrupt, under cover and for the benefit of the said Robert Garry, a member of the bankrupt firm herein."

---

"(5) Upon information and belief, that the said Robert Garry wrongfully, fraudulently, willfully, and knowingly, and with fraudulent intent to conceal his financial condition, and in contemplation of bankruptcy, destroyed his books of account from which his financial condition might be ascertained, and which said books of account consisted of the following, to wit, ledger, cashbook, journal, checkbook, returned checks and vouchers and papers kept by the said Robert Garry in the city of New York, during the years 1908 and 1909 and up to the time of the filing of the petition in bankruptcy, said books having been used by the said Robert Garry, and relating particularly to the business conducted by the said Robert Garry in the city of New York during the years 1908 and 1909, and relating to the New York end of the business of the said bankrupt, as well as a large part of the books used at the Birmingham end of said business, consisting of journal, cashbook, checkbook, and returned checks and vouchers from the American Trust & Savings Bank used in and about and in connection with the business at Birmingham, Ala., during the years 1908 and 1909, up to the date of filing of the petition in bankruptcy.

"(6) Upon information and belief, that the said Robert Garry knowingly, wrongfully, willfully, and with fraudulent intent to conceal his financial condition, and in contemplation of bankruptcy, concealed his books of account or records from which his financial condition might be ascertained, said books of account of record consisting of the following, to wit, ledger, cashbook, journal, checkbook, returned checks and vouchers and papers kept by the said Robert Garry in the city of New York during the years 1908 and 1909 and up to the time of the filing of the petition in bankruptcy, said books having been used by the said Robert Garry, and relating particularly to the business conducted by the said Robert Garry in the city of New York during the years 1908 and 1909, and relating to the New York end of the business of the said bankrupt, as well as a large part of the books used at the Birmingham end of the said business, consisting of journal, cashbook, checkbook, returned checks and vouchers from the American Trust & Savings Bank, used in and about and in connection with the business at Birmingham, Ala., during the years 1908 and 1909, up to the date of the filing of the petition in bankruptcy.

"(7) Upon information and belief, that the said Robert Garry, individually, and as a member of the firm of the above-named bankrupt, wrongfully, willfully, and with fraudulent intent to conceal his financial condition, and in contemplation of bankruptcy, failed to keep books of account or records from which his financial condition might be ascertained."

Exceptions were filed, and the matter was submitted to the District Judge, who rendered the following decree:

"In re Robert Garry & Company, Bankrupt. In Bankruptcy.

"This cause coming on to be heard upon the application of the bankrupt for his discharge and upon the amended specifications of objection filed thereto by the Jefferson County Savings Bank, and upon the evidence introduced by the bankrupt and the objecting creditor, respectively, on the hearing before the special master, and the court being of the opinion that the depositions, the report of the receiver, and the testimony of all the witnesses before the referee in bankruptcy, except that of the bankrupt, is incompetent and should be excluded, and being of the further opinion that, excluding all such testimony, the amended specifications of objection relating to the concealment and destruction of the bankrupt's books of account are established by the preponderance of the evidence, it not being necessary to consider or pass upon the issues presented by the other specifications of objection:

"It is therefore ordered and adjudged that the depositions, report of the receiver, and the testimony of all the witnesses, except the bankrupt, in the examination before the referee in bankruptcy, be and they are hereby excluded.

"It is further ordered, adjudged, and decreed that the application of the bankrupt for his discharge be and it is hereby denied, and that the costs of the proceeding for the discharge of the bankrupt be taxed against the bankrupt."

From this decree, the bankrupt prayed an appeal, which was duly allowed.

Geo. Huddleston, for appellant.

R. Dupont Thompson and Leonard Bronner, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). The question presented on this appeal is whether any one of the specifications of objections numbered first, fifth, sixth, and seventh, fully recited in above statement, is sufficiently proved to warrant the refusal to discharge the bankrupt.

The judge a quo was of opinion that the fifth and sixth were established by the preponderance of evidence, and that it was not necessary to pass upon the first and seventh.

[1] Counsel contend that the contest of a bankrupt's discharge is a quasi criminal proceeding and governed by rules of criminal practice, and therefore that a mere preponderance of evidence is not sufficient. We are of opinion that, as stated in Collier (7th Ed.) 268, while the ordinary rules of evidence control, the proof must be strict and convincing, but not necessarily to the limit required in proving a crime.

The question is fully and ably discussed by Judge Putnam in Troeder v. Lorsch et al., 150 Fed. 710, 711, 80 C. C. A. 376, and we concur with what is there said on the subject.

In support of the first specification, we find much suspicion, some presumption, but no sufficient evidence to prove that the bankrupt concealed $15,000, or any other sum of money belonging to the bankrupt's estate.

[2] The three other specifications charge the bankrupt with failure to keep books of accounts or records from which his financial condition might be ascertained; the destruction of the books of accounts relating particularly to the business conducted by the bankrupt in the city of New York during the years 1908 and 1909, as well as a large part of the books used at the Birmingham end of said business during the years 1908 and 1909; and, lastly, concealing the books of accounts or records relating to the business in New York, as well as a large part of the books used at Birmingham. And these specifications can be considered together.

There is no evidence to substantiate the charge that the bankrupt failed to keep books of accounts and records from which his financial condition might be ascertained.

There is no evidence supporting the finding that books of accounts showing the financial condition of Robert Garry & Co., kept at Birmingham, were destroyed or concealed.

All the evidence there is in the case bears on the proposition that the books of accounts kept in New York or relating to the business of Robert Garry & Co. in New York were concealed or destroyed.

Keeping in mind the undisputed fact that the firm of Robert Garry & Co. in New York was dissolved and the business wound up in November of 1908, the inquiry seems to be restricted to the proposition that the bankrupt concealed or destroyed books showing the financial condition of the firm in New York, and the evidence in support

of this is that when Robert Garry went to Birmingham to go on with the business of Robert Garry & Co., in that city, he left the New York books in New York, and thereafter in May, 1909, when examined before the referee, he was verbally ordered by the referee to produce the said books and turn them over to the trustee, which order he failed to comply with, and that in testifying how and when and with whom he left the books there is some discrepancy between the answers he gave on his examination before the referee and those given a year later when examined before the special master. Besides this, the special master considered, as tending to show that the bankrupt had concealed and destroyed his books, that on his examination before the referee he had given evasive and untruthful answers to questions relating to the matters contained in the books.

It is not pretended that any written order to produce the New York books at any time or place was ever served upon the bankrupt. Nor is it claimed that at any time the bankrupt was provided with means to go to New York, find his books, and bring them to the referee or trustee. It cannot be inferred that when the firm of Robert Garry & Co., in New York, was dissolved and liquidated in November, 1908, there was any misconduct in leaving the books relating to the business of that firm in New York, in the absence of all proof to the effect that there and then Robert Garry contemplated that the firm of Robert Garry & Co., in Birmingham, would thereafter be forced into bankruptcy.

On the examination before the referee the bankrupt testified that the New York firm kept a full set of books and he left them in New York with a former bookkeeper named Henry Kaplain and asked him to store them. Cross-examined as to details, the following appears:

"Q. At that time did you keep a full set of books?
"A. Yes, sir.
"Q. You are sure.
"A. Yes sir.
"Q. Keeping a cashbook and ledger, etc.?
"A. I don't know about that.
"Q. You said a full set of books, didn't you?
"A. Well, I guess they did then.
"Q. Do you wish me to understand, and the court to understand, that you were keeping a business like that going, and still don't know whether they kept a cashbook and a ledger and other books that are kept in such a business?
"A. I couldn't say, Mr. Brunner, because I don't know, you know."

On the bankrupt's examination by his own counsel before the special master a year later, he testified as follows:

"Q. What books did the New York firm keep?
"A. We kept a ledger, an expense book, and we kept a charge book. Our charge book was made with copies of the bill. We sent one to customer, and copy we kept and put in a binder, a cashbook.
"Q. Did you keep an invoice book?
"A. Yes, sir.
"Q. And checkbook?
"A. Yes, sir.
"Q. Any other books?
"A. Do not know. We kept a regular and usual set of books used in that business.

"Q. What become of those books?

"A. Well, I wound up all the business of Robert Garry & Co. and paid everybody merchandise with the exception of this $5,000 of the bank, and I got through with it, and some one else moved in, and we sold the furniture, and I got through with the books, and I left them there. They were useless to me, and I left them there, and I had my bookkeeper—he quit me a long time before, some time about January. And he would come around there and help me, and I left them there, and I do not know whether those people moved them out or left them in the same place.

"Q. Who was the firm?

"A. The manager was named Mulligan.

"Q. Where were the books when you last saw them?

"A. 465–7 Broome street.

"Q. What part of the house?

"A. Second floor; we call it here the second floor, but they call it the ground floor.

"Q. Were they on the floor?

"A. We had a big desk, and I sold the furniture and fixtures, and I moved it in the back part of the store. He moved in on us unexpected.

"Q. When you closed there you had quit the business?

"A. Yes, sir; entirely.

"Q. And had paid everybody all the bills you owed—you only owed this bill to the bank?

"A. Yes, sir.

"Q. And nobody owed you anything that was in business?

"A. No, sir.

"Q. Who owed you anything at that time?

"A. Nobody. I wound up with notes with some concerns and discounted them in the bank, so that closed up all the books.

"Q. What date was that?

"A. In February, 1909, I left on the 20th, was the last time I saw them.

"Q. Have you made any inquiry for those books since?

"A. I did. I asked my brother about it, and they were still there in August, and I went up there in January of this year and saw Mr. Mulligan, and he said somebody moved out with the load of furniture.

"Q. Did you destroy any of those books?

"A. No, sir.

"Q. Did you conceal them?

"A. No, sir.

"Q. What is the name of your bookkeeper?

"A. Kaplain.

"Q. What request did you make of him about those books?

"A. I asked him to find them, and I asked Sam Garry, not knowing his address, and I saw Mr. Kaplain personally in January. He came to see me, and I asked him about them, and he said he did not know. He said they were all there."

The discrepancy between the bankrupt's evidence before the referee and that before the special master and the reticence in the former compared with the fullness in the latter gives rise to a suspicion as to his credibility, but no strong inference that the bankrupt had either concealed or destroyed his books. There is little doubt that in the lengthy and to some extent badgering examination before the referee the bankrupt was evasive to the verge of untruth; but for that we do not put all the blame on the bankrupt. The special master says:

"Robert Garry, in testifying before the master, appeared unmistakably a man of much intelligence, of quick, ready, and accurate apprehension, and of keen business sagacity. He was 39 years old and in the maturity of sound mental and physical vigor. His business experience on his own ac-

count rose from peddler to dominant partner in two large mercantile houses —the one in New York, the other in Birmingham."

He might have added that Garry came to Birmingham at the age of 16, when his education was necessarily incomplete; that he was ignorant of commercial bookkeeping and, so far as the case shows, had always relied on his bookkeeper to keep his books. These facts, taken in connection with the character of the examination, which evidently soon impressed Garry that he was in the "house of his enemies," who were seeking to lead him into pitfalls and traps through attempted explanations of book entries that he himself had not made, and mainly at Birmingham when he was not there (for it was in relation to items in the Birmingham books that the most evasive answers were given), tend somewhat to soften the otherwise natural conclusion that he was willfully evading explanation and was withholding information with a bad intent.

But it we concede that the bankrupt's conduct in this respect was all that the appellee claims, and, further, that he was in fault for not producing before the trustee his New York books, and that his conduct pending the bankruptcy has been recalcitrant, we are still unable to find in all the evidence of the case strict and convincing proof that the bankrupt either concealed or destroyed his books, which is the crux of the specifications of opposition to the bankrupt's discharge under consideration on this appeal.

We do not agree with the special master that the evidence is perfectly clear and convincing that the bankrupt failed to keep books of account and that he concealed them or destroyed them; nor with the judge a quo, who held that the preponderance of evidence showed the bankrupt concealed and destroyed his books of account, and, as on this appeal we must follow our own convictions as to the sufficiency of the evidence to establish the specified objections of opposition herein involved, we are constrained to reverse the decree of the District Court and remand the cause, with instructions to grant the appellant his discharge in bankruptcy.

And it is so ordered and decreed.