In re PERLMUTTER et al.

(District Court, D. New Jersey. April 30, 1919.)

1. BANKRUPTCY ⟨⟩414(3)—DISCHARGE—ACTS PREVENTING—FRAUDULENT CREDIT AND TRANSFER OF PROPERTY—DEGREE OF PROOF.

The acts referred to in Bankruptcy Act, § 14b, cls. 3, 4 (Comp. St. § 9598), commission of which works denial of the bankrupt's discharge, are civil in their nature, and do not require for their establishment evidence beyond a reasonable doubt; a clear preponderance of the evidence being sufficient to prove them.

2. BANKRUPTCY ⟨⟩414(1)—DISCHARGE—FRAUDULENTLY OBTAINED CREDIT—PRESUMPTION OF INTENT.

A member of a firm of tradesmen which subsequently became bankrupt is presumed to have intended the effect his statement of the financial condition of the firm produced upon a lender to it; the lender having a right to assume the statement was true.

3. BANKRUPTCY ⟨⟩407(5)—DISCHARGE—LOAN FRAUDULENTLY OBTAINED—PRIMA FACIE CASE.

When creditors, objecting to the discharge of a bankrupt, showed that his statement of his firm's financial condition, presented to a lender to induce the loan, was untrue in a material respect, that the bankrupts had obtained money on its credit, and that its untruthfulness related to a subject within the knowledge of the bankrupt, who gave currency to the untruth, they made a prima facie case disentitling him to discharge.

4. BANKRUPTCY ⟨⟩414(1)—DISCHARGE—LOAN FRAUDULENTLY OBTAINED—PRESUMPTION OF INTENT—BURDEN OF PROOF.

Where creditors, objecting to a bankrupt's discharge, had established facts from which was presumed his intent to deceive in issuing to a lender

to the firm a statement of assets, the burden to remove such presumption was on the bankrupt.

5. BANKRUPTCY ⊂⊃414(3)—DISCHARGE—LOAN FRAUDULENTLY OBTAINED—SUFFICIENCY OF EVIDENCE.

Evidence *held* to show that a bankrupt, applying for discharge, in issuing a false statement of the financial condition of his firm to a lender, intended to and did deceive the lender, so that, under Bankruptcy Act, § 14b, cl. 3 (Comp. St. § 9598), discharge must be denied.

6. BANKRUPTCY ⊂⊃408(3)—DENIAL OF DISCHARGE—CONCEALMENT OF ASSETS—INTENT.

A discharge in bankruptcy must be denied the bankrupt, under Bankruptcy Act, § 14b, cl. 4 (Comp. St. § 9598), for having concealed assets, even though no intent to defraud be proved; it being sufficient if the intent to hinder and delay creditors existed.

7. BANKRUPTCY ⊂⊃414(1)—DENIAL OF DISCHARGE—CONCEALMENT OF ASSETS—PRESUMPTION.

The effect of a bankrupt's withdrawal of assets from his insolvent firm being to hinder and delay the creditors in securing payment of their debts, in the absence of contrary proof on his application for discharge, objected to by creditors, it is to be presumed that the withdrawal was so intended.

8. BANKRUPTCY ⊂⊃414(1)—DENIAL OF DISCHARGE—WITHDRAWAL OF ASSETS—PRIMA FACIE CASE—BURDEN OF PROOF.

Where creditors, objecting to a bankrupt's discharge, made a prima facie case of unlawful abstraction of his firm's funds by him, within Bankruptcy Act, § 14b, cl. 4 (Comp. St. § 9598), the burden shifted to him to overcome the case so made.

9. BANKRUPTCY ⊂⊃414(3)—DENIAL OF DISCHARGE—WITHDRAWAL OF ASSETS—SUFFICIENCY OF EVIDENCE.

Evidence of a bankrupt on creditors' objections to his discharge *held* insufficient to meet the burden to overcome the prima facie case made by the creditors by proof that he withdrew funds from his insolvent firm when the appointment of a receiver was imminent.

In Bankruptcy. In the matter of Joseph Perlmutter and Harry Perlmutter, individually and as copartners trading as "Perlmutters" and "The Quality Shop," bankrupts. On exceptions to the special master's report, recommending that discharges be granted. Discharges denied.

See, also, 256 Fed. 860.

Heyman & Heyman, of Jersey City, N. J., for objecting creditors.

Mark Townsend, Jr., of Jersey City, N. J., for bankrupts.

RELLSTAB, District Judge. [1] The special master, to whom was referred the objections to granting discharges to the individual bankrupts, Joseph Perlmutter and Harry Perlmutter, recommends that the objections be dismissed and the discharges granted. Of the assigned objections to granting the discharges, it is necessary to refer to only two. These are based upon clauses 3 and 4, respectively, of section 14b of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 550 [Comp. St. § 9598]). The acts enumerated in these clauses, the committing of which works a denial of the bankrupt's discharge, are civil in their nature and do not require for their establishment evidence beyond a reasonable doubt; a clear preponderance of the evidence is sufficient to prove them. United States v. Regan, 232 U. S. 37, 34 Sup. Ct. 213, 58 L. Ed. 494; Troeder v. Lorsch (C. C. A. 1) 150 Fed. 710,

80 C. C. A. 376, 17 Am. Bankr. Rep. 723; Klein v. Powell (C. C. A. 3) 174 Fed. 640, 98 C. C. A. 394, 23 Am. Bankr. Rep. 494; Garry v. Jefferson Bank (C. C. A. 5) 186 Fed. 461, 108 C. C. A. 439, 26 Am. Bankr. Rep. 511; In re Howden (D. C.) 111 Fed. 723, 7 Am. Bankr. Rep. 191; In re Greenberg (D. C.) 114 Fed. 773, 8 Am. Bankr. Rep. 94; In re Leslie (D. C.) 119 Fed. 406, 9 Am. Bankr. Rep. 561; In re Atlas (D. C.) 219 Fed. 783, 34 Am. Bankr. Rep. 44; In re Brincat (D. C.) 233 Fed. 811, 37 Am. Bankr. Rep. 587; In re Garrity, 247 Fed. 310, 159 C. C. A. 404, 40 Am. Bankr. Rep. 664.

As to the objection based on clause 3: It is charged that the bankrupt firm obtained a loan of $5,000 from the New Jersey Title Guarantee & Trust Company upon a materially false statement in writing, dated February 28, 1916, made by Joseph Perlmutter on behalf of such firm, for the purpose of obtaining that money from the Title Company. It is conceded that Joseph Perlmutter, on behalf of the firm, rendered a statement in writing, which was untrue in failing to state the firm's indebtedness to Elizabeth Perlmutter and to Eva Perlmutter, the former the wife of Joseph, and the latter the sister of both Joseph and Harry, Perlmutter. This indebtedness, representing loans made to the firm, aggregated $8,800 principal, besides several years' accrued interest, of which principal there was owing to Joseph's wife $7,000 and to his sister $1,800. On behalf of these bankrupts it is contended that the Title Company did not rely upon the statement in making the loan; and that it was not willfully and knowingly false.

The master did not make any finding as to the first proposition, and as to the second he held that the objecting creditors had not borne the burden of proof cast upon them, and had not proved that the statement was knowingly false.

As to the first of these contentions: It is sufficient to say that the evidence clearly establishes that the Title Company relied upon the statement in making the loan, and that if it had known that the bankrupts owed the sums in question, the loan would not have been made.

As to the second contention: Both partners knew that the firm owed their sister, Eva, and Joseph's wife the sums stated, and that it had paid interest thereon for a number of years. The statement of the firm's financial condition was made for the purpose of securing a loan from the Title Company following an unsuccessful effort by Joseph, on behalf of the firm, to secure a loan of $5,000 from the First National Bank of Jersey City, with whom the firm for many years had done its banking business. This statement was prepared by the firm's bookkeeper at Joseph's request and while the latter was at the office of an attorney at law, to whom he had been referred by an officer of that bank, and whose aid he had solicited in securing the loan after he had made the unsuccessful effort just referred to, and after this attorney had had an interview with an officer of the Title Company. Upon the receipt of such statement, and after talking it over with this attorney, and at the latter's suggestion, the value of the real estate was reduced from $150,000 to $110,000. The statement was thereupon redrawn and signed by Joseph and forwarded by the attorney to the Title Company, who then made the loan in question.

This financial statement expressly distinguishes between the firm's merchandise and loan creditors. As to the former, it gave no names and stated the amount due them in gross; but as to the latter, it gave the names of each, with the amount due them, respectively, and, as noted, it failed to include the names of the sister and Joseph's wife and the amounts due them.

The discharge authorized by the Bankruptcy Act is not for all bankrupts. It is expressly withheld from those whose conduct brings them within the provisions of section 14 of the Bankruptcy Act.

In Gilpin v. Merchants' National Bank (C. C. A. 3) 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023, 21 Am. Bankr. Rep. 429, it was held by the Circuit Court of Appeals of this circuit that the word "false," used in clause 3 of that section, "means more than merely erroneous or untrue, being used in its primary legal sense as importing an intention to deceive, and such a statement, in order to constitute a bar to a discharge, must have been knowingly and intentionally untrue." This narrower meaning here given to the word "false" has been uniformly adopted by the federal courts. Of the later cases so holding, I note the following: Aller-Wilmes Jewelry Co. v. Osborn (C. C. A. 8) 231 Fed. 907, 146 C. C. A. 103, 36 Am. Bankr. Rep. 714; Firestone v. Harvey (C. C. A. 6) 174 Fed. 574, 98 C. C. A. 420, 23 Am. Bankr. Rep. 468; Doyle v. First National Bank (C. C. A. 4) 231 Fed. 649, 145 C. C. A. 535, 36 Am. Bankr. Rep. 331; In re Augspurger (D. C.) 181 Fed. 174, 25 Am. Bankr. Rep. 83; In re Arenson (D. C.) 195 Fed. 609, 28 Am. Bankr. Rep. 113; In re O'Callaghan (D. C.) 199 Fed. 662, 29 Am. Bankr. Rep. 304; In re Stafford (D. C.) 226 Fed. 127, 35 Am. Bankr. Rep. 747; In re Smith (D. C.) 232 Fed. 248, 37 Am. Bankr. Rep. 230; In re Landersman (D. C.) 239 Fed. 766, 38 Am. Bankr. Rep. 685.

In the Gilpin Case the bankrupt had signed the statement (a printed blank) before it was filled in, and directed his bookkeeper to complete it and send it to the bank. This the bookkeeper did, indorsing on the filled-in statement the word "approximate." There was no evidence that the bankrupt ever saw it after he had signed it in blank, or that he was thereafter interrogated in regard thereto.

It is to be observed that in the Gilpin Case the word "approximate," indorsed on the filled-in blank, tended to negative that the statement was intended to be accurate, and further that, unless the bankrupt was to be held responsible for what his bookkeeper did within the scope of his authority and in response to a duty he imposed upon him, the bankrupt could not be held to have issued the statement in the form that it was delivered to the bank. In both of the recited particulars that case differs from the instant one. The Perlmutter statement was signed by Joseph after it was revised by his attorney, with whom he had discussed it, and there was nothing on its face or in the letter transmitting it to the Title Company that would suggest that it was not to be taken as a true statement of the firm's financial condition.

[2, 3] As to the proof of intention: A rational being is presumed to intend the natural and probable consequences of his words and conduct, and Joseph Perlmutter, in issuing the statement, is presumed to

have intended the effect it produced upon the Title Company. The latter had a right to assume that the statement was true, and, as it parted with its money on the strength of the statement, the person responsible for the untruth, in the absence of proof showing the contrary, will be presumed to have intended to hide from the lender the firm's true financial condition. In re Goldich (D. C.) 164 Fed. 882, 21 Am. Bankr. Rep. 249; In re Schachter (D. C.) 170 Fed. 683, 22 Am. Bankr. Rep. 389; In re Augspurger, supra; In re Miller (D. C.) 192 Fed. 730, 27 Am. Bankr. Rep. 606; In re Arenson, supra; In re Simon (D. C.) 201 Fed. 1004, 29 Am. Bankr. Rep. 808; In re Janavitz (C. C. A. 3) 219 Fed. 876, 135 C. C. A. 546, 34 Am. Bankr. Rep. 105; In re Arnold (D. C.) 228 Fed. 75, 35 Am. Bankr. Rep. 740; In re Josephson (D. C.) 229 Fed. 272, 36 Am. Bankr. Rep. 505; In re Landersman, supra; In re Amster (D. C.) 249 Fed. 256, 41 Am. Bankr. Rep. 249. When the objecting creditors showed that this statement was untrue in a material respect, that the bankrupts had obtained money from the bank on the credit of it, and that its untruthfulness related to a subject within the knowledge of Joseph who gave currency to the untruth, they had made a prima facie case disentitling him to a discharge. Had the proofs closed with this showing of facts, they and the inferences arising therefrom would have necessitated the denying of a discharge to Joseph. Kelly v. Jackson, 31 U. S. (6 Pet.) 622, 8 L. Ed. 523; Lilienthal's Tobacco v. U. S., 97 U. S. 237, 266, 24 L. Ed. 901; In re Greenberg, supra; In re Arenson, supra.

Was this prima facie case displaced or impaired? From the other testimony it appears that these claims of Elizabeth and Eva Perlmutter were of many years' standing; that they had from their beginning been carried as liabilities on the firm's books and the trial balances which were frequently made; but that their names, as creditors, or the amounts due them, were never mentioned in the two financial statements which the firm gave to the Mercantile Agency, and which were signed by Joseph Perlmutter. These mercantile statements were dated, respectively December 31, 1915, and January 1, 1917. Why include the wife and sister, as creditors, in the trial balances, and not in the financial statements issued to the mercantile agency? Honest dealing would require that they be inserted in the financial statements, whether they were included in the trial balances or not. Neither Joseph nor Harry Perlmutter needed to be reminded by the trial balances of the existence of their indebtedness to their sister and Joseph's wife. Facts of that character would never be forgotten by a normal being thus related to creditors. But the inclusion of the amount of the indebtedness owing to them would be necessary in a financial statement issued to a mercantile agency, if it, or those for whose interest such statement was being sought, were to have knowledge of the actual financial condition of the bankrupt firm.

How came the bookkeeper to include these debts in the trial balances and to exclude them from the financial statements? He testified that these debts were in existence and appeared on the books in 1913, when he entered the bankrupt firm's employ, and that Joseph's wife and sister were carried as creditors on the books, down to the institution of

the bankruptcy proceedings; that he never got any specific instructions how he should do his work; that he understood he was to follow the custom of his predecessor; that in making the monthly and annual trial balances he included the debts owing to the wife and sister of Joseph as liabilities, but that he omitted them from the financial statements made for the mercantile agency, and that he did so because that was the way it had been done before, and he felt that if that was wrong he would be corrected; that, as he recalled it, he made out the statement of February 28, 1916, the one made to secure the loan from the Title Company, from the mercantile statement of December 31, 1915 and the "small memorandum book in which notes were carried," and sent it to Joseph at his request; that he recalled no specific instructions to omit the claims of Joseph's wife and sister from that statement, but that he was told by Joseph to "make an itemized statement," and that the only reason they were not included in these statements was because they had never been included in any previous statement. He also said that the trial balance of January 31, 1916, showed a loan indebtedness of $1,000 made by Joseph Perlmutter March 5, 1915, and which he had been informed had been advanced to the firm by his wife, and that he considered it had the same status as her and Eva Perlmutter's claims; that in the trial balance for the firm at the end of the year Harry Perlmutter also appeared as a creditor for $1,750, but that neither that claim nor Joseph's for $1,000 appeared in the financial "statements given out."

What does Joseph say about these omissions? With reference to the statements issued to the Mercantile Agency: He says that they were made by the bookkeeper on his order, that he did not compare them with the books, and that he signed them, not knowing them to be untrue, and without any intent "to give out a false or untrue statement."

As to the one sent to the Title Company: At first, though admitting that he signed the statement, Joseph disclaimed any knowledge as to when it was drawn, the purpose for which it was given, that he had any attorney at that time, or that he gave it to any one to give to the Title Company. Subsequently he recalled that, while he was at the office of the attorney before mentioned (who has since deceased) and to whom he had been referred by an officer of the First National Bank of Jersey City, he telephoned to the firm's bookkeeper to make such statement; that this attorney went over it and made him cut down the real estate value; that it was then rewritten by the attorney's stenographer, and that, after he had the attorney add to the statement that he (Joseph) "still valued the property at $150,000, which he had cut down to $110,000, or something like that," he signed it and left it with him. He further said that he did not know then (at the time of testifying) whether his wife's or sister's indebtedness was shown on that statement or not; that he assumed that the bookkeeper had put down everything that was on the books and that the statements so furnished him were correct; that he never gave a thought to the indebtedness due his wife and sister when he made the statement that went to the Title Company, and that they were not left out willfully, and that he had no intention of deceiving the Title Company or any one else.

It is to be noted that Joseph does not say that at the time of giving out this statement he did not consider these relatives as creditors, as has been unsuccessfully said by other bankrupts who failed to name their relatives in financial or mercantile statements. In re Augspurger, supra; In re Arenson, supra; Josephs v. Powell & Campbell (C. C. A. 2) 213 Fed. 627, 130 C. C. A. 291, 32 Am. Bankr. Rep. 222. He would have the court believe that at that time his mind was oblivious to the fact that the firm was debtor to his wife and next of kin. A suggestion of that character must have more behind it than appears in this case to receive judicial acceptance. Debts owing to near relatives stand out in the mind more distinctly than any other kind. In re Brener (D. C.) 166 Fed. 930, 931, 20 Am. Bankr. Rep. 644; In re Arenson, supra. And the experience of general creditors in bankruptcy matters shows that the minds of failing debtors are not any different in this respect.

Reverting to this particular financial statement, we note that there was set before Joseph, not a statement showing the liabilities in gross, as was the case in the financial statements rendered to the Mercantile Agency, but one that was itemized, giving the names of the loan creditors and the amounts due them respectively. A glance at the list of these creditors seemingly ought to have brought home to him the fact that the names of his near relatives, as loan creditors, were not included.

But, if that did not do it, how can we escape the conclusion that the absence of these names must have come to his knowledge during the time this statement was considered by him and his attorney, and from which it emerged in the amended form that it reached the Title Company's hands? In its amended form the statement showed only a net worth of $12,800. If the omitted indebtedness, with accrued interest, had been added, this net worth would have been practically eliminated, and the statement as a basis for credit useless.

Thus environed, Joseph's disclaimer of any intention to deceive the Title Company, lacking corroboration, is valueless. As was said by this court in Re Arenson, supra, in regard to a like disclaimer: "It is a defense at the command of any one, and, in the absence of corroborating circumstances, is entitled to little weight." The Title Company was entitled to a true statement, and Joseph, in the absence of convincing evidence that the omission of his wife's and sister's indebtedness from the statement in question was unintentional, must be held to have intended to conceal from this prospective lender a knowledge of such indebtedness, and also all the consequences normally flowing from such deception.

[4] The master did not certify that he considered Joseph's explanation on the question of intent as convincing, but he recommended Joseph's discharge on the ground noted, viz., that the objecting creditors had not sustained the burden of proof cast upon them. In so holding the master cast a greater burden on them than the law requires. They had established facts from which the intent to deceive was presumed. The burden to remove such presumption was on Joseph. Whether this shifted burden was sustained was a question of fact. In the present case Joseph's denial of intent to deceive is not supported by any of the

other evidence, but, as shown, is contrary to all the probabilities flowing naturally from the proven facts. The burden cast on the objecting creditors at the outset was fully met when they established the prima facie case referred to, and the uncorroborated disclaimer by Joseph of any intention to deceive did not displace or even impair it.

[5] It follows that the master's recommendation, so far as Joseph Perlmutter is concerned, cannot be approved, and that his application for a discharge must be denied.

[6] As to the objection based on clause 4 of section 14b of the Bankruptcy Act: This is that Harry Perlmutter, within two days preceding the filing of the petition in bankruptcy, withdrew $1,700 in cash from the funds of the bankrupt firm, which he concealed and refuses to pay to the trustee. To conceal is "to hide, withdraw, remove or shield from observation; cover or keep from sight." Century Dict. & Cyc. In section 14b (4) of the Bankruptcy Act the word "conceal" is associated with transfer, remove, and destroy, and any of these, when done with intent to hinder, delay, or defraud creditors, works a denial of the discharge. In re Shoesmith (C. C. A. 7) 135 Fed. 684, 687, 68 C. C. A. 322, 13 Am. Bankr. Rep. 645; In re Glazier (D. C.) 195 Fed. 1020, 1021, 28 Am. Bankr. Rep. 391. It is not necessary that intent to defraud be proved. If the intent to hinder and delay exists, it is sufficient. In re Hughes (D. C.) 183 Fed. 872, 874, 25 Am. Bankr. Rep. 556; In re Condon (D. C.) 198 Fed. 947, 950, 29 Am. Bankr. Rep. 907. See, also, Collier on Bankruptcy (11th Ed.) pp. 90–98, 395–396.

The petition in bankruptcy was filed on August 3, 1917, and on the 6th of that month both Harry Perlmutter and his brother, Joseph, filed separate admissions of inability to pay their debts, either as individuals or copartners, and consented to be adjudged bankrupts on that ground. The firm's books show, and Harry Perlmutter admitted, that on the 1st day of August, 1917, he withdrew approximately the sum of $1,700 from the funds of the firm. He testified that he had previously loaned that amount to the firm, and that he paid a gambling debt with it. No contention is made in Harry's behalf that he had a right to withdraw that sum from the firm's funds, and as the firm was a copartnership, of which he was one of the copartners, it is immaterial whether he had previously loaned that amount to it or not. As the firm at that time was insolvent, that sum, as well as other funds and property of the firm, should have been kept for the payment of the firm's debts.

On August 2, 1917, the day following the withdrawal of this money, a bill was filed in the New Jersey Court of Chancery against Harry Perlmutter by his brother Joseph, and a receiver was appointed on that day to take charge of the copartnership property. The filing of this bill was due in part to the firm's financial difficulties and in part to differences that then existed between these brothers. Seemingly the application for a receivership was the result of an understanding between them; but, whether that is so or not, it is clear that Harry knew that such application was to be made before he withdrew the money in question.

[7] He had never drawn any large sums from the funds before, and the unprejudiced mind is constrained to the conclusion that the immi-

nence of the taking over of the firm's property by a court receiver was the controlling reason which prompted him to withdraw the money at that particular time. As against the creditors of the bankrupts, the withdrawal of such money was unlawful, and, if traceable, is recoverable by the trustee. The effect of such withdrawal was to hinder and delay the creditors in securing the payment of their debts, and, in the absence of proof to the contrary, it is to be presumed that it was so intended. In re Hughes, supra; In re Condon, supra; In re Singer (C. C. A. 2) 251 Fed. 51, —— C. C. A. ——, 41 Am. Bankr. Rep. 503.

[8] The master gave scant consideration to this ground of objection to Harry's discharge. He does. not say that he believed his explanation of what he did with this money. He dismissed this objection with the statement that "the creditors have failed to sustain their objections by proper proof." In so determining the master overlooked the fact that, when the objecting creditors had shown, as they did, that Harry withdrew this money from an insolvent firm on the very eve of the appointment of the receiver, the imminence of which appointment was known to him, and that he refused to turn it over to the trustee, they had made a prima facie case of unlawful abstraction of the firm's funds, within the meaning of section 14 of the Bankruptcy Act, and that the burden was shifted to him to overcome the case so made. In re Leslie, supra; Seigel v. Cartel (C. C. A. 8) 164 Fed. 691, 90 C. C. A. 512, 21 Am. Bankr. Rep. 140; In re Nisenson (D. C.) 182 Fed. 912, 24 Am. Bankr. Rep. 915. Until he did this, nothing further was required of the objecting creditors.

[9] How did he meet this burden? He furnishes nothing but his bald statement that he used this money to pay a gambling debt of many years' standing. This is a defense easily concocted and as easily expressed, and carries little weight unless corroborated.

The burden of overcoming a prima facie case is not satisfied by such evidence. To hold otherwise would be to put a burden on the objecting creditors generally impossible for them to carry and to put them at the mercy of any unscrupulous debtor's say-so. In re Leslie, supra. In the Nisenson Case and the cases cited therein at page 916, viz. Schweer v. Brown (C. C. A. 8) 130 Fed. 328, 64 C. C. A. 574, 12 Am. Bankr. Rep. 178, In re Lasky (D. C.) 163 Fed. 99, 20 Am. Bankr. Rep. 729, and In re Henderson (D. C.) 130 Fed. 385, 12 Am. Bankr. Rep. 351, and in the later cases of In re. Silverman (D. C.) 206 Fed. 960, 30 Am. Bankr. Rep. 798, and In re Vyse (D. C.) 220 Fed. 727, 34 Am. Bankr. Rep. 378, the courts were concerned with "turn-over" orders. Yet even in these cases, admittedly requiring stronger proof to sustain such orders than is necessary in proceedings to withhold the bankrupt's discharge, because of the drastic means that might be invoked to enforce the "turn-over" orders (imprisonment for contempt), the uncorroborated testimony of the bankrupt that he had gambled the money away, and therefore was unable to comply with such orders, was deemed insufficient to set them aside.

The prima facie case made against Harry Perlmutter has not been overcome, and he also is denied his discharge.